# EXHIBIT 13

IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
THIRD DIVISION

EDISON RUNYAN; DWIGHT RIPES; EARL L. PURIFOY; JOHN ROSS, As the Legal Representative of ELIZABETH ROSS; MARY WEIDMAN; DURAIN WEIDMAN; MARION HARRIS; and VAN R. NOLAN, Each Individually, and on Behalf of All Others Similarly Situated,

                                     Plaintiffs

V.              CV 2009-2066

TRANSAMERICA LIFE INSURANCE COMPANY; LIFE INVESTORS INSURANCE COMPANY OF AMERICA; MONUMENTAL LIFE INSURANCE COMPANY; and AEGON USA, INC.,

                                       Defendants

BE IT REMEMBERED, that on the 23rd day of April, 2009, the above-referenced cause came before the Honorable Jay Moody for hearing. The proceedings were had and done as follows:

```
 1                A P P E A R A N C E S

 2  REPRESENTING THE PLAINTIFFS:
        TOM THOMPSON, Esquire
 3      CASEY CASTLEBERRY, Esquire
        Murphy, Thompson, Arnold, Skinner & Castleberry
 4      Post Office Box 2595
        Batesville, Arkansas   72503
 5
        STAN P. BAUDIN, Esquire
 6      Pendley, Baudin & Coffin, LLP
        24110 Eden Street
 7      Plaquemine, Louisiana   70764

 8      PHILIP BOHRER, Esquire
        SCOTT E. BRADY, Esquire
 9      Bohrer Law Firm, LLC
        8712 Jefferson Highway, Suite B
10      Baton Rouge, Louisiana   70809

11  REPRESENTING THE DEFENDANT:

12      LYN PRUITT, Esquire
        JOHN K. BAKER, Esquire
13      Mitchell, Williams, Selig, Gates & Woodyard, PLLC
        425 West Capitol Avenue, Suite 1800
14      Little Rock, Arkansas   72201

15      MARKHAM R. LEVENTHAL, Esquire
        Jordan Burt, LLP
16      777 Brickell Avenue, Suite 500
        Miami, Florida   33131

17

18

19

20

21

22

23

24

25
```

```
 1        THE COURT:  We are on the record in civil case
 2   2009-2066, Edison Runyan, et al, v. Transamerican Life
 3   Insurance Company, here on a joint motion for
 4   preliminary approval of the class settlement.
 5        I have gone through the documents and I think I'm
 6   pretty much up to speed about what we're going to do
 7   here today.  Who would like to take over?  Mr. Baker?
 8        MR. BAKER:  Your Honor, I am John Baker.  I am
 9   here with my partner, Lynn Pruitt, on behalf of the
10   defendants.  I wanted to introduce Your Honor to a
11   Floridian who has been admitted pro hoc vice, who also
12   represents the defendants, Mr. Mark Leventhal from
13   Jordan Burt in Miama.
14        We also have plaintiff's counsel from Batesville,
15   Arkansas, Mr. Thompson and Mr. Castleberry, and then we
16   have some Louisiana attorneys who also have been
17   admitted pro hoc vice, Mr. Baudin, Bohrer, and Brady.
18   I think that's right.  The three Bs.
19        THE COURT:  Welcome everybody.
20        MR. BAKER:  And Your Honor, we have clean copies
21   of a proposed order that was attached to the joint
22   motion.  The only thing that's really changed in it is,
23   we filled in the dates when we all filed the joint
24   motion.  We've left blank, if Your Honor is inclined to
25   grant it, the date on which the final hearing would be
```

1 held. We believe that according to the calculations in
2 the settlement documents, that likely has to occur
3 after around July 16th or 17th. So if you're inclined
4 to look favorably upon our proposed order that we have
5 here for Your Honor to consider, the final hearing
6 would be sometime -- hopefully Debbie could find a day
7 in the last two weeks of July or, I guess, early
8 August.
9       But essentially, I want to introduce
10 Mr. Leventhal to kind of give you just a thumbnail
11 sketch of what has brought us to this settlement or
12 proposed settlement and the history of it. We know the
13 dry written word sometimes can be encapsulized much
14 more quickly in an oral recitation. We know you've
15 read the pleadings. But Mr. Leventhal wants to give
16 you a bit of background on that, and I know the
17 plaintiffs want to address the Court briefly, as well.
18       THE COURT: All right.
19       MR. LEVENTHAL: Good afternoon, Your Honor. Mark
20 Leventhal from Jordan Burt. We -- although it's not
21 traditional, I guess, to tout the experience of the
22 lawyers, because in this type of proceeding, the
23 experience of the class counsel and the counsel is
24 important to the Court.
25       Just briefly, the plaintiffs' lawyers will tell

```
 1  you about their experience, but they are very
 2  experienced in class action litigation, as well as
 3  litigation of this type involving these types of
 4  policies.  I've been defending class actions for about
 5  15 years.  I've been involved in well over 150 class
 6  actions, and probably have litigated in 20 to 25
 7  different states.
 8       So if you have any questions procedurally or
 9  otherwise -- and also Ms. Pruitt is probably one of the
10  leading class action lawyers in this state.  If we
11  can't answer your questions, I don't know who could.
12       With that said, we provided Your Honor with all
13  of the papers, and I think we've tried to explain the
14  background and the legal standard.  We are here today
15  on a -- simply a preliminary approval.  And the
16  standard set out in the case law is sort of like a
17  range of reasonableness.  It's not until the final
18  fairness hearing several months down the road, after
19  everyone has a chance to submit evidentiary materials,
20  if there are any objectors, they will bring those
21  objections to the Court, that the final approval is
22  held.  So that's why we're here today.
23       I do want to explain why we're here in this Court
24  in particular, and what this litigation is about.
25  We've been litigating with our esteemed plaintiffs'
```

1  lawyers and, quite frankly, have, from time to time,
2  been at each other's throats. We've been litigating
3  since, I'd say, June of 2007, when the first of their
4  cases was filed. We have had extensive discovery in
5  the federal court proceedings. There are seven cases,
6  including this one, in which plaintiffs' counsel is
7  involved. Several in Arkansas, and then a few others
8  around the country.
9       There is another case in Mississippi, a class
10 action in Michigan, and two individual cases in
11 Louisiana. But the first of their cases was filed in
12 federal court here in Arkansas. There are -- there is
13 another case in the western district of Arkansas. So
14 we've been litigating for quite sometime, although this
15 case has been recently filed.
16      Why are we before this Court is essentially a
17 procedural matter. We wanted to have a global
18 resolution. So you'll see that the complaint is a
19 national class in this case, which, for our purposes,
20 covers about 46 or 48 states, because that's where the
21 policy holders are located.
22      The case, really, the hub of the litigation is
23 here in Arkansas because the company is located in
24 Little Rock. Transamerica, which is the successor of
25 Life Investors, has a location here in Little Rock, and

1 that's where these policies have been administered out
2 of.
3     We have been, like I say, involved in some
4 contentious litigation. And we first began talking
5 about the possibility of settlement over five months
6 ago. I think we had our first meeting in October of
7 last year. Then we had a two-day mediation in November
8 of last year before a former federal district judge.
9 We didn't settle at that mediation. We continued to
10 talk. Class certification was denied about a week
11 later in the case before Judge Wright in federal court
12 here, which is a state court class. We continued to
13 discuss settlement, and we reached an agreement within
14 the past week or so, and we filed it with this Court.
15     The reason I'm bringing all this background up is
16 -- because is, you'll see that the papers talk a lot
17 about arm's length negotiation. You couldn't have had
18 more arm's length negotiation than we had in this case
19 in the process that we went through. And I wanted the
20 Court to understand that, because I think it's
21 important in the context of a preliminary approval.
22     What are these cases about? The cases involve a
23 supplemental cancer insurance policy. And what that
24 means is, it's called supplement because it is in
25 addition to other insurance. It's not like a

1  comprehensive health insurance policy. It will pay
2  cash benefits to the insured, even though they have
3  other insurance. So in other words, if you're
4  diagnosed with cancer, and say you have to go into the
5  hospital, one of the benefits it pays is X hundred
6  dollars -- $200 per day while you're in the hospital.
7      And it has certain other fixed dollar benefits.
8  If you have a lab test, you may get $150. If you have
9  certain surgeries, you may get X dollars, depending on
10 the schedule in the policy. And it also has some other
11 benefits that pay based upon the actual charges of the
12 services.
13     So for example, chemotherapy is one of the
14 benefits that pays the actual charges for the
15 chemotherapy. So if someone goes to the hospital, gets
16 the chemotherapy, for example, they may be fully
17 covered under their own health insurance. They may be
18 fully covered under Medicare. But they will get a
19 check under this policy in cash for the actual charges
20 of the chemotherapy.
21     Now, the dispute that's one of the central
22 disputes in this case revolves around what does actual
23 charges mean. And what happened in this particular --
24 with this particular case, back in 2004, the company
25 began to do a review of its premium increases. These

policies also, the premiums can increase. You file the premium increases with the state departments of insurance. And as health care costs and claim costs go up, the premiums for the policies can go up also.

The company began investigating causes of the increases and determined that it was overpaying the benefits for actual charges. And how did that happen? It happened because these policies, when they originated back in the '70s, which is now, say, 30 years ago, the claims procedures were set up to pay benefits based upon the doctor's bills.

And so the insureds, to make their claim, to submit their proof of loss for actual charges for chemotherapy or whatever the case may be, would submit doctor's bills. The company would pay those bills.

Well, over time, what happened in the health care industry, with PPOs, HMOs, the billing practices changed and providers began to issue statements or paperwork that were not actually real bills. And sometimes they would have prices on there that weren't actually being paid. We call those list prices today. Hospitals are notorious for that nowadays. They inflate their list prices, sometimes to exorbitant amounts for economic reasons, maybe for trying to increase their reimbursements from Medicare, for

```
 1   whatever reason.
 2        But in any event, there is now sort of a lack of
 3   transparency, so to speak, in health care pricing.  And
 4   many patients will get statements that aren't actually
 5   bills, and will have maybe chemotherapy X dollars.  And
 6   those prices, list prices, are not actually being
 7   charged.  They're not actually being paid.
 8        But in any event, the company, over time, began
 9   to pay its claims on that basis.  So it did this
10   review.  They determined it was overpaying the claims
11   for actual charges.  It sent out a notice to the
12   policyholders explaining that, said that now when we
13   submit claims, effective April or May 1 of 2006, it
14   corrected its claim forms and procedures, make sure you
15   send in documentation, whether it be EOBs or Medicare
16   summary statements that show the actual amounts that
17   are really owed and being paid to the doctors.  And
18   that is one of the central issues in the case.
19        The plaintiffs disagree with that.  The
20   plaintiffs say that no, the company was wrong to do
21   that.  The company was paying claims for actual charges
22   one way and now it's changed its interpretation of
23   actual charges.  So therefore, it breached the
24   contract, acted in bad faith.
25        The company says no, that's not correct.  Actual
```

```
 1  charges has to be interpreted according to its plain,
 2  simple, ordinary meaning.  Under the context of this
 3  policy, it can only mean the actual amount that's
 4  really owed and being paid.  Those have to be the
 5  actual charges.  So that's kind of a legal dispute in
 6  the case, and it's really one of the central disputes
 7  for those policyholders who have been paid claims.
 8       The other aspect of the case are the premium
 9  increases.  Of -- I believe there are approximately
10  115,000 cancer policies outstanding, there are
11  approximately 4,700 of those policies who have been
12  paid claims on actual charges after April, May of 2006.
13  But there are a large number of policyholders who have
14  not been paid claims.  Those policyholders are
15  interested in their premiums, so -- and they want to
16  keep the premium increases as low as possible because
17  they want to keep their policies.  They don't want them
18  to become unaffordable.
19       So in any event, we finally came to an agreement,
20  after a lot of negotiation.  And I think that we're all
21  agreed that the settlement is very fair and very
22  reasonable and provides a lot of significant benefits
23  to all the different categories of policyholders.
24       I'm not going to go through the settlement
25  benefits unless Your Honor has any questions.  But what
```

I will say is, it was a -- it was a very extensively negotiated process. And I think, as I said, we're all very comfortable with it.

And the last point I want to make, which is also reflected in the papers, there have been several other settlements in cases of this type. And we believe when you compare them, that there is no question that this is better than those settlements. One of the them in particular, which is called Skeleton v. Central United -- I believe I attached the final judgment to our brief. That was a settlement that has already received final approval by a trial court in Alabama.

It provides some monetary benefits that are not as good as the ones that we have provided in this case. And it also doesn't provide anywhere near the amount of nonmonetary or injunctive relief that we've provided.

There is also another settlement, the Robertson v. Liberty National case. We attached the findings of fact and conclusions of law that were entered in connection with the final judgment in that case. And again, when you compare those to our case, I don't think there's any question that ours is ultimately fairer, better, and provides more benefits to the policyholders.

But in any event, we're here today merely on

1  preliminary approval, and the legal standard for that
2  requires that the Court simply find that what has been
3  proposed is within a range of reasonableness. And I
4  think -- I don't think there's any question that we
5  will meet that standard. So with that, I'll turn this
6  over to Mr. Bohrer. And if he has any additional words
7  on behalf of the plaintiffs.
8      MR. BOHRER: May it please the Court, I'll be
9  very brief. I really just want to assure the Court
10 that in conducting the analysis, that the threshold
11 legal requirements were easily and completely satisfied
12 in this case. And I know it's a little unique because
13 there's not a long litigation history of this
14 litigation in your Court.
15     But you'll find further down the road that this
16 case, this issue, has been litigated comprehensively
17 and extensively for two years now. And I can assure
18 you that the plaintiff lawyers in this case have an
19 adequate amount of information to make an informed
20 decision.
21     We've done depositions. We've conducted
22 discovery. We know what the landscape is. We are
23 familiar with these other settlements. And so with
24 respect to the legal requirement that, number one, the
25 settlement appears to be fair, reasonable, and

```
 1  adequate.  We submit, Your Honor, that it is.
 2       Number two, it's clearly within the range of
 3  possible or reasonable recoveries, given other
 4  settlements which establish market value.  And then
 5  finally, most importantly, they are -- it has been
 6  contentious litigation.  And this is not a settlement
 7  that is the result of any type of fraud or collusion,
 8  and the record will establish that.  Other than those
 9  comments, Your Honor, I'm happy to answer any questions
10  that the Court may have.
11       THE COURT:  I don't have any at this time.  Thank
12  you.
13       MR. BOHRER:  Thank you.
14       THE COURT:  Court is going to approve the
15  preliminary class settlement.  Mr. Baker, do you want
16  to check with Debbie first or do you want me to sign it
17  and fill it in or what?  How much time --
18       MR. BAKER:  One day.  A full day uninterrupted
19  will be sufficient, we believe.  I can run in there
20  real quick and see what she has in late July.
21       THE COURT:  Okay.  Anything further?
22       MR. BOHRER:  Not from the plaintiffs, your Honor.
23       MR. BAKER:  Not for the defendants, Your Honor.
24  Thank you for your time.
25            * * * * * * * * * * * *
```

Case 4:09-cv-00157-JRM-E Document 123-1 Filed 07/12/13 Page 16 of 16
Case 4:09-cv-00157-JMM-E Document 16/21/2014 Entry No. 128 Page 16 of 16 PageID #: 1297

15

```
                        C E R T I F I C A T E
STATE OF ARKANSAS       )
                        )    SS.
COUNTY OF PULASKI       )
```

I, TAMMIE L. FOREMAN, CRR, RPR, CCR, official court reporter for the Third Division Circuit Court, Pulaski County, Arkansas, certify that I reported the proceedings by stenographic machine shorthand, reporting in the case of
EDISON RUNYAN; DWIGHT PIPES; EARL L. PURIFOY; JOHN ROSS, As the Legal Representative of ELIZABETH ROSS; MARY WEIDMAN; DURAIN WEIDMAN; MARION HARRIS; and VAN R. NOLAN, Each Individually, and on Behalf of All Others Similarly Situated,
                                          Plaintiffs
V.              CV 2009-2066
TRANSAMERICA LIFE INSURANCE COMPANY; LIFE INVESTORS INSURANCE COMPANY OF AMERICA; MONUMENTAL LIFE INSURANCE COMPANY; and AEGON USA, INC.,
                                          Defendants
before the Honorable Jay Moody, Pulaski County Circuit Judge, at Little Rock, Arkansas; that said proceedings have been reduced to a transcription by me by means of computer-aided transcription, and the foregoing pages 1 through 14 constitute a true and transcript of the proceedings held to the best of my ability, along with all items of evidence admitted into evidence.

I further certify that I am not a relative or employee of any of the parties, or of counsel, nor am I financially or otherwise interested in the outcome of this action.

I serve as an impartial officer of the court and abide by all professional and ethical principles of the National Court Reporters Association.

WITNESS MY HAND AND SEAL on this 26th day of June, 2009.

TAMMIE L. FOREMAN, CRR, RPR, CCR
Certificate No. 305
Notary Public in and for
Pulaski County, Arkansas

My Commission Expires: 04-18-14

TAMMIE L. FOREMAN, CRR, RPR, CCR
(501) 340-8425