# EXHIBIT 18, Part 1 of 4

```
 1          IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
                             THIRD DIVISION
 2

    EDISON RUNYAN; DWIGHT PIPES; EARL L. PURIFOY; JOHN ROSS,
 3  As the Legal Representative of ELIZABETH ROSS; MARY
    WEIDMAN; DURAIN WEIDMAN; MARION HARRIS; and VAN R.
 4  NOLAN, Each Individually, and on Behalf of All Others
    Similarly Situated,
 5
                                            Plaintiffs
 6
    V.                       CV 2009-2066
 7

 8  TRANSAMERICA LIFE INSURANCE COMPANY; LIFE INVESTORS
    INSURANCE COMPANY OF AMERICA; MONUMENTAL LIFE INSURANCE
    COMPANY; and AEGON USA, INC.,
 9
                                            Defendants
10

11                    A P P E A R A N C E S

12  REPRESENTING THE PLAINTIFFS:
        TOM THOMPSON, Esquire
13      Murphy, Thompson, Arnold, Skinner & Castleberry
        Post Office Box 2595
14      Batesville, Arkansas   72503

15      STAN P. BAUDIN, Esquire
        Pendley, Baudin & Coffin, LLP
16      24110 Eden Street
        Plaquemine, Louisiana   70764
17
        PHILIP BOHRER, Esquire
18      SCOTT E. BRADY, Esquire
        Bohrer Law Firm, LLC
19      8712 Jefferson Highway, Suite B
        Baton Rouge, Louisiana   70809
20
    REPRESENTING THE DEFENDANT:
21      JOHN K. BAKER, Esquire
        Mitchell, Williams, Selig, Gates & Woodyard, PLLC
22      425 West Capitol Avenue, Suite 1800
        Little Rock, Arkansas   72201
23
        MARKHAM R. LEVENTHAL, Esquire
24      JULIANNA THOMAS McCABE, Esquire
        Jordan Burt, LLP
25      777 Brickell Avenue, Suite 500
        Miami, Florida   33131
```

```
 1   REPRESENTING NAOMI CROCKER:
          RICHARD T. PHILLIPS, Esquire
 2        JASON NABORS, Esquire
          Smith Phillips
 3        Post Office Drawer 1586
          Batesville, Mississippi  38606
 4
     REPRESENTING JACKIE QUEEN, HOWARD BARNHILL,
 5   JOANNE W. GIBSON, STEPHEN K. HEGE, AND LILLIAN LOGAN:
          PATRICK KNIE, Esquire
 6        Post Office Box 3544
          Spartanburg, South Carolina  29304
 7

 8   REPRESENTING WILLIAM SHEPHERD:
          TODD TURNER, Esquire
 9        DAN TURNER, Esquire
          Turner & Turner
10        Post Office Box 86
          Arkadelphia, Arkansas  71923
11

12

13

14

15        BE IT REMEMBERED, that on the 9th day of

16   November, 2009, the above-referenced cause came before

17   the Honorable Jay Moody for hearing.   The proceedings

18   were had and done as follows:

19

20

21

22

23

24

25
```

3

```
1          THE COURT:  Good morning, everybody.  We are on
2    the record in civil case 2009-2066, Runyan, et al, v.
3    Transamerican Life, et al.  Since my court reporter is
4    familiar with some of you but not all of you, as you
5    approach the podium, if you could give her your name.
6    I'm not aware of who all y'all are either, but -- and
7    who you represent.  That would benefit us greatly in
8    giving y'all a more accurate record.
9          I think we have some preliminary motions to take
10   up that logically would be ruled on prior to us going
11   into the fairness hearing.  Mr. Baker, you are
12   approaching the podium.  Are you in charge?
13         MR. BAKER:  Not necessarily, Your Honor.  But I
14   did want to -- I am John Baker.  I'm here for the
15   defendants.  And there are several motions, I believe
16   all of which were filed within the last 10 days or so.
17   There is a whole flurry of them.  And although today
18   has been scheduled for the fairness hearing, we think
19   clearly these are all meritless and they're all
20   untimely.  They've all been considered by the Court at
21   one time or another.  They all ought to be denied.
22         If you want to hear argument on them, we're
23   certainly willing to do it because these are attempts
24   nonetheless to slow down this train, regardless of what
25   Your Honor decides today, and they're meritless.  But
```

```
1   if Your Honor wants us to brief them, we're certainly

2   willing to do that.  But we don't want them to slow

3   down our fairness hearing presentation because that's

4   what everybody has been working towards instead of

5   responding on these little motions they keep filing.

6        THE COURT:  Well, I guess I need to make sure

7   that -- I came in this weekend and read what I thought

8   was everything.  It's all in a box.  And I've got

9   William Shepherd's motion to reconsider or, in the

10  alternative, for a motion to opt out what I call the

11  South Carolina objectors, which are Queen, Barnhill,

12  Gibson, and is it Hege motion to carve out a subclass,

13  I guess; Shepherd's motion to produce, and then I think

14  Patrick -- how do you pronounce your last name?

15       MR. KNIE:  It's Knie, K-n-i-e, Your Honor.

16       THE COURT:  Knie.  Okay.  Give myself a phonetic

17  note right there.  I think I've entered your order for

18  pro hac already, but I don't know that.

19       MR. BAKER:  You did.

20       THE COURT:  Is there anything else that --

21       MR. BAKER:  Well, Brother Matthews has filed

22  something called a --

23       THE COURT:  Brother Matthews and I -- at the risk

24  of sounding like we were exparte, he came over and

25  summarily got most of his relief denied on Friday.
```

```
 1        MR. BAKER:  We heard about that.
 2        MR. MATTHEWS:  We had a 10-second hearing.  He
 3   denied -- everybody has been denied summarily.
 4        MR. BAKER:  I understood that the Court denied it
 5   to the extent it sought to stay today.  But I didn't
 6   understand if Your Honor had also denied his motion to
 7   set aside preliminary approval order, which was also
 8   part of his motion.
 9        THE COURT:  Well, I granted Mr. Matthews' motion
10   to be substituted as counsel for Randy Coleman, denied
11   his motion for a continuance.  And that's all we dealt
12   with on that day.
13        MR. BAKER:  Okay.  Then I think at least by
14   title, at least, although it's not argued much in his
15   filings, his title says his motion is also to set aside
16   the preliminary approval order, which I know Your Honor
17   has taken you up in a prior motion and denied.  So I
18   think --
19        THE COURT:  For the record, that motion to set
20   aside the preliminary order will be denied also because
21   we're here.  I mean, I'll either --
22        MR. BAKER:  But I think that's the totality of
23   the motions pending.  And again, not all of them are
24   ripe for resolution, but we are prepared to argue them
25   and we think they're all without merit.  And so if we
```

1  want to do that at the end of the hearing today or
2  right now --
3       THE COURT:  Well, let me ask, if I can find him.
4  Mr. Turner, had you intended to argue your motion to
5  reconsider and to opt out, or did you want me to rule
6  on that on the pleadings?
7       MR. DAN TURNER:  I was prepared to argue it, Your
8  Honor.  I didn't know if you would want to take it up
9  before the fairness hearing or at the conclusion of it.
10      THE COURT:  Well, help me out here.  Had you and
11 Mr. Shepherd filed an objection?
12      MR. DAN TURNER:  He had not, Your Honor.
13      THE COURT:  Okay.  And so I guess that's what I
14 was thinking is, Mr. Shepherd may have had an
15 objection.
16      MR. DAN TURNER:  No, sir.  We're not here to
17 speak on behalf of Mr. Shepherd with respect to the
18 fairness hearing itself, Your Honor.  Just the motion
19 that we filed.
20      THE COURT:  Okay.  The South Carolina objectors
21 do have, obviously, an objection.  I don't know if
22 those should have been marked as intervenors or
23 objectors.  But I think logically, that needs to be
24 ruled on prior to the fairness hearing because if
25 they're a subclass, they're not objecting.  I don't

```
 1    know if they are or not.  I guess not necessarily.
 2    They could have a subclass and object, I guess.  But
 3    I'm not sure.
 4         MR. BAKER:  Well --
 5         THE COURT:  I would prefer to, at a minimum, hear
 6    that motion before we have the fairness hearing.  And I
 7    think whether or not Mr. Shepherd opts out or not or --
 8    Mr. Turner, I do have to hear your motion to reconsider
 9    your motion to intervene.
10         MR. DAN TURNER:  I have no objection to you
11    ruling on that on the pleadings, Your Honor.
12         THE COURT:  Okay.  Well, I've already referred to
13    that, and that's going to be denied.  Your alternative
14    motion to opt out, we can deal with after the fact.  So
15    Mr. Knie, are you carrying the water for South
16    Carolina?
17         MR. KNIE:  I'm all they've got right now, Your
18    Honor.  I don't play any football, so I couldn't have
19    helped them Saturday.
20         THE COURT:  I'm sure you'll do them proud.  You
21    have the floor.
22         MR. KNIE:  Thank you, Your Honor.
23         MR. BOHRER:  Your Honor, could you give us two
24    minutes before we proceed, if you don't mind?
25         THE COURT:  You can do it there or you can step
```

```
 1    into my office, or wherever you feel comfortable.
 2              (Discussion held off the record.)
 3         MR. LEVENTHAL:  Your Honor, we want to understand
 4    exactly what we're arguing because we're not aware that
 5    Mr. Knie has a motion pending.
 6         THE COURT:  Well, the motion I have pending, I
 7    guess -- and laying my hands on it may be the trick,
 8    but Deborah can do it in a hurry.  But it is
 9    essentially --
10         MR. BOHRER:  Is this it, Your Honor?
11         MR. LEVENTHAL:  That's the only thing that we
12    have that looks like a motion.
13         THE COURT:  Maybe I can describe what relief they
14    were asking, and y'all can put it to a motion because
15    I'm having trouble laying my hands on it.  But I had
16    understood that since certain laws have been passed in
17    certain states dealing with this issue, that Mr. Knie
18    had requested that I designate a subclass, for lack of
19    a better term, for each state to comply with those
20    state laws.
21         MR. LEVENTHAL:  I think you are referring to his
22    objection.
23         THE COURT:  Okay.
24         MR. LEVENTHAL:  Which we would argue later during
25    the objection phase.
```

```
1        MR. KNIE:  May it please the Court, I did file
2   two written motions, and --
3        THE COURT:  Our docket sheet, at least the clerk
4   downstairs -- and I can't put it as it says, "South
5   Carolina's objections and motion to carve out South
6   Carolina from proposed national class settlement."  And
7   whether that's -- it makes a difference, I guess, but
8   it seems -- I took it as a separate motion aside from
9   their objection.
10       MR. LEVENTHAL:  I don't think we've ever seen
11  that motion.
12       THE COURT:  Well --
13       MR. KNIE:  Your Honor, those were actually sent
14  to the clerk of the circuit court of this county by
15  Mr. Hopkins, one of my cocounsel, on October 29th.
16  There were two.  The first one was motion to carve out
17  South Carolina.  The second one, motion to extend opt-
18  out time.
19       THE COURT:  Yeah.  And I've got it on the clerk's
20  docket as 10-30-09.  So that would have been at the
21  courthouse 10 days ago, I guess.  But -- and I read it,
22  but I don't know what I did with it.
23       MR. BOHRER:  Your Honor, we do have something, I
24  think.
25       MR. KNIE:  It actually was -- for counsel's
```

```
 1    information, that letter contained those two motions,
 2    and then it contained the supplemental materials that
 3    we submitted.
 4         MR. BOHRER:  We have it.  We just had not seen it
 5    referred to.
 6         THE COURT:  Here's the motion to carve out, if
 7    you want to look at it real quick.  I'll bet you could
 8    read it in about 20 seconds.
 9         MR. LEVENTHAL:  Well, I mean, looking at this,
10    Your Honor, this is nothing more than trying to convert
11    an objection into a motion.  If the Court wants to hear
12    argument on it, we'll be glad to argue it.
13         THE COURT:  All right.  Can I have mine back, or
14    do you need it to argue?  Go ahead, Mr. Knie.
15         MR. KNIE:  Thank you, Your Honor.  May it please
16    the Court, Patrick Knie from Spartanburg, South
17    Carolina.  The first motion before the Court is a
18    motion to carve out South Carolina as a class.  We're
19    actually asking this Court for relief in the form of
20    being totally released from this litigation.
21    Obviously, the Court has the power, in the alternative,
22    to create a subclass that would protect and define the
23    rights that are unique to the citizens of South
24    Carolina.
25         Very briefly, Your Honor, there are three main
```

```
 1   issues that I would like to cover.  First, I'm sure as
 2   the Court is well aware, South Carolina is -- from the
 3   plaintiff's perspective, is very fortunate to have the
 4   Ward decision, which is the rule of law in our state.
 5   The Ward decision defined -- found that "actual
 6   charges" was an ambiguous term.  And therefore, the 4th
 7   Circuit Court of Appeals looked at it in favor of the
 8   plaintiffs and said that actual charges meant the
 9   actual amount billed by medical providers.
10        As a result of that 4th Circuit decision, the US
11   District Court in South Carolina ultimately granted
12   summary judgment and judgment on the pleadings.  I have
13   those documents, Your Honor, with me.  And in this maze
14   of materials that we have, sometimes they're hard to
15   find.
16        But if I may, Your Honor, I would hand up the
17   order on damages in the South Carolina case.  Actually,
18   it's the order of judgment.  I apologize.  The
19   significant -- if I may, Your Honor.
20        THE COURT:  Sure.
21        MR. KNIE:  The significant point in that order of
22   judgment is -- and for counsel's information, that's
23   entry number 403 Federal District Court in South
24   Carolina in the Ward case, is the exhibit.  And what
25   happened as a result of the fact that summary judgment
```

```
 1   was granted, Your Honor, is that South Carolinians in
 2   that case, which is an identical case to our case, were
 3   not awarded a maximum of $15,000, but were awarded
 4   amounts like 75,000, 126-, 193,000, 167-, amazing
 5   amounts of money because these policies were very
 6   lucrative as they were first administered.
 7        And so to force South Carolinians to be put in a
 8   category with individuals from other states that don't
 9   have the benefit of the Ward decision would be a
10   travesty of justice for those individuals.  Mr. Hege
11   alone has $75,000 in claims pending.  He's a terminal
12   cancer patient.  He may end up with $300,000 in claims.
13   So we would first say, because of the Ward decision
14   alone, South Carolinians should be carved out.
15        Secondly, the defense in this case has made a
16   great deal, not only in South Carolina, but with
17   respect to the whole national class in talking about a
18   South Carolina statute which was enacted in 2008 that
19   now defines what they believe to be the correct
20   definition of actual charges.  Well, what they have not
21   informed the Court is that in fact, that statute has
22   been ruled by this same judge, Judge Joe Anderson, as
23   prospective in nature, meaning that it does not apply
24   to any of the policyholders that are subject to this
25   class action settlement.
```

```
 1        Now, the travesty of all that is, that statute is
 2   in the class notice.  And so when South Carolinians
 3   read the class notice and saw that there's this statute
 4   that defines actual charges in some new way and that it
 5   must apply to them, that's totally incorrect.  And with
 6   the Court's permission, I would pass up that order -- I
 7   think it deals with other things, as well.  But I think
 8   page 6 -- well, page 7 I've actually highlighted for
 9   you, Your Honor, where it will show as clearly
10   prospective.
11        So there's a problem, Your Honor, of course, with
12   the notice because of that.  We have the Ward decision.
13   And I'll wait a minute while the Court reads.
14        THE COURT:  I've read it.  Thank you.
15        MR. KNIE:  But we are even more unique.  We have
16   a South Carolina insurance regulation that is in effect
17   in our state that says you cannot reduce or eliminate
18   benefits of a policyholder in our state without their
19   signed agreement to that effect.  So what this Court
20   would be doing is judicially setting aside that
21   insurance regulation and saying despite the fact that
22   South Carolinians have to sign for them doing what they
23   want to do to us, this Court is saying that's okay.
24   And as far as this class settlement, that doesn't
25   matter.  And I don't -- I wouldn't think that would be
```

```
 1    the Court's intent to do that.

 2         Now, in addition, Your Honor, to the best of my

 3    knowledge, these gentlemen, in their effort to bring

 4    this matter before the Court, have not done any

 5    detailed analysis of South Carolina law.  And if they

 6    have, I certainly have not seen it thus far presented

 7    to the Court.

 8         Your Honor, the -- there is a US Supreme Court

 9    decision that says in a national class, that that is

10    important.  And of course, had they done that for this

11    Court -- and they may still be planning on doing that

12    today -- this Court would be aware of the points that I

13    have just made.

14         Your Honor, one last point that I think is very

15    important.  We have a line of cases that follow a state

16    court decision, Nichols v. State Farm, that creates a

17    common law, a bad faith cause of action specifically

18    against insurance companies in our state.  Now, what

19    that would allow these objectors and other class

20    members to do in South Carolina is to bring individual

21    actions, just not for their actual damages -- in some

22    of these cases, actual damages, as the Court can

23    readily see, go to 2-, 300,000.  But also to obtain

24    punitive damages.

25         Why would we assume that these may be punitive
```

1   damages cases?  We only have to look to the Metzger

2   decision in Oklahoma, where the Court -- where the

3   plaintiff was granted over $10 million in punitive

4   damages in that individual case.

5       So what I'm saying is, we really are unique, Your

6   Honor.  We really don't belong in this class.  We have

7   a pending federal district court class action going on

8   in South Carolina that can certainly adequately protect

9   these South Carolinians.  There are 6,269 of them that

10  are policyholders.  I think 231 have been stricken by

11  cancer and would have claims in this settlement.  Many

12  of those are going to be six figure claims.

13      And so it's the old story that sometimes in

14  trying to make one size that fits all, it just doesn't

15  work.  And the best thing to do is to shrink the class

16  a little bit to a size that is manageable, where all

17  the class members are being treated the same way.

18  Because South Carolinians would be treated disparately

19  if they were involved -- if they were required to stay

20  in the class.  I don't want to wax on too long.  I know

21  you've got a lot to do, Your Honor.  I do have another

22  motion to make.

23      THE COURT:  All right.  Go ahead.

24      MR. KNIE:  I filed, I believe, as a written

25  motion asking the Court to extend time to opt out and

```
 1    require further disclosure.  Some of the arguments are
 2    the same, Your Honor.
 3         The South Carolina notice -- I mean, the notice
 4    that South Carolinians received, just like everybody
 5    else, Judge, talked about this South Carolina actual
 6    charges statute.  All they had to do is to add one
 7    sentence to that notice to say, "However, it only
 8    applies prospectively --" or in the future to make it
 9    clear to South Carolinians that it really does not
10    apply to current policyholders.
11         But they didn't do that, and they are --
12    certainly were aware of the state of the law or should
13    be aware of the state of the law, and should be aware
14    of Judge Joe Anderson's decision.  If they were
15    required to renotice, we could solve several blunders
16    and inadequate explanations and, frankly, a
17    misrepresentation about the South Carolina statute.
18         Your Honor, there's another problem that I would
19    like to call the Court's attention to, and there's
20    another reason why this matter needs to be renoticed.
21    And there was a letter -- one of several South
22    Carolinians received letters in response to complaints
23    why are you cutting my benefits.  Here's an example of
24    one received by one policyholder on August 15th, 2006,
25    from a Connie Whitlock, vice president of the
```

1  defendant.

2      And on page 2, Your Honor, you will see that

3  Ms. Whitlock refers to the district court decision in

4  Ward, the first decision before it was reversed by the

5  Supreme Court -- I mean, the Court of Appeals.  And

6  it's telling this policyholder, "This is the rule of

7  law in South Carolina."  Well, the problem, Judge, if I

8  may, is that they never wrote and told these

9  policyholders later that the rule of law had changed.

10  And it would have been very simple to do that in 2009,

11  when they sent out the class notice, some three years

12  later, by simply saying, "By the way, the Ward decision

13  has now been reversed in South Carolina."

14      Would that have been a fair notice?  Absolutely.

15  And in a national class, the law is clear.  You have a

16  duty, if you're sending out the notice, to advise

17  various states of particular and unique laws in their

18  state.  So while that was not a misrepresentation when

19  it was mailed, the failure to later inform the class in

20  the class notice of what took place, Your Honor, at

21  least as to South Carolinians, misled them.  So for

22  those reasons, we feel like a new notice needs to be

23  sent and that it needs to have further disclosure to

24  South Carolinians, in the event that the Court just

25  doesn't carve us out, which is the simple solution to

```
 1   this problem, Your Honor.
 2        Your Honor, also, in the alternative, once again,
 3   it's my understanding that if the Court, for some
 4   reason, chose to deny these first two motions -- and I
 5   would hope that you would grant the first.  Then I
 6   would move in the alternative -- and I believe during
 7   the course of the hearing in Arkansas, you can move
 8   verbally without the need for filing a written
 9   pleading.  But I would move that you would at least
10   allow Steve Hege and Lillian Logan, a Georgia class
11   member that I represent, to opt out of this class.
12        Mr. Hege nor Ms. Logan had counsel when they
13   decided to object rather than opt out.  They're
14   terminally.  I mean, they couldn't travel here to
15   Arkansas to defend themselves.  They have secured my
16   services since.
17        And the sad part with Mr. Hege, being a South
18   Carolinian, he had to make the decision to object
19   rather than opt out not knowing about the Ward
20   decision, not knowing about the prospective nature of
21   the South Carolina statute, not knowing about the South
22   Carolina insurance regulation, or the line of cases in
23   Nichols about bad faith because it wasn't in the
24   notice.  So in the end, what we're all about, this is
25   a, quote, "fairness hearing," Judge.  We're just here
```

```
 1   to be fair.  And I don't see how anybody in this

 2   courtroom can stand up and make a credible argument

 3   that this is fair to South Carolinians.

 4        MR. LEVENTHAL:  That, Your Honor, was one of the

 5   most frivolous motions I have ever heard in my life.

 6   Let me take them one by one.  First of all, let me

 7   explain who Mr. Knie is.  Mr. Knie is among the group

 8   in South Carolina that, just like everybody else in

 9   this courtroom, got the Court's notice when this

10   fairness hearing was set.  The Court sent out its

11   notice on September 24th.  Everybody knew it was

12   November 9th.  Waited till October 29th, about a week

13   ago or so, filed an emergency motion to enjoin this

14   fairness hearing in South Carolina and asked for an

15   emergency hearing last Thursday, which was denied on

16   Friday by the Court in the Belue case.

17        And the amazing thing about it was, it was the

18   exact same motion that the Gooch lawyers had filed in

19   Tennessee, which had been set aside by the 6th Circuit.

20   So they wait about a week before this hearing is going

21   to take place, they file the exact same motion to

22   enjoin.  They move for an emergency hearing before the

23   South Carolina judge, which we had to scramble like

24   crazy to address.  And now they come in here with these

25   motions.  Well, let's take these motions.
```

1    First of all, the first motion.  This is a motion

2    which is entirely proper -- improper.  What it is is to

3    opt out the entire state of South Carolina.  We sent

4    the notice to the South Carolina policyholders.  They

5    don't represent the South Carolina policyholders.  We

6    have hundreds, if not thousands, of South Carolina

7    policyholders who filed claims with the settlement

8    administrator.

9        Secondly, they have their own clients who they do

10   represent, which they already opted out.  They opted

11   out Mr. Hill, Mr. Belue, the plaintiffs in the Belue

12   case.  This letter that Mr. Knie just showed you is

13   addressed to Mr. Joel Hill.  Well, Mr. Joel Hill

14   already opted out.  This is one of the gentlemen that

15   has a case in South Carolina.

16       This Court's preliminary approval order expressly

17   says you can't opt out a group of people.  Opt outs

18   have to file their own request for exclusion.  So the

19   motion number one is improper because it violates the

20   Court's preliminary approval order.

21       It's improper, number two, because they don't

22   represent these people.  In fact, with that emergency

23   motion to enjoin this Court, they also filed an

24   emergency motion to certify the class in South

25   Carolina, which the Court also did not deny it, said

```
 1    I'm not going to rule on this until January.  So they
 2    have no certified class.  They have no standing.  They
 3    have no right to represent any of those South Carolina
 4    policyholders.
 5         Next, let me talk about the Ward case.  The Ward
 6    case was a decision by a panel of two judges, which was
 7    expressly designated as unpublished and not binding
 8    precedent in the 4th Circuit.  The Ward case held
 9    basically that actual charges was ambiguous.  The South
10    Carolina Department of Insurance was so upset by that
11    decision that they lobbied the legislature to pass a
12    statute defining actual charges in South Carolina,
13    which now exists.  There is a bulletin.  Does the Court
14    have our supplemental appendix?
15         THE COURT:  I do.  Nicely bound.
16         MR. LEVENTHAL:  Nicely bound.  And in that
17    supplemental appendix -- is it Exhibit 24?
18         THE COURT:  Is this the one you are referring to?
19         MS. McCABE:  Yes.
20         MR. LEVENTHAL:  Exhibit 24 is a bulletin by the
21    South Carolina Department of Insurance.  And what this
22    bulletin does, it explains the statute that the South
23    Carolina department lobbied for and had passed
24    specifically to overrule the Ward case.  And if you
25    turn to the second page of this bulletin, it explains
```

```
 1    the statute.
 2         The statute codifies the department's long-
 3    standing interpretation of the term "actual charges."
 4    For many years, spanning the terms of three directors
 5    of insurance, the department has consistently
 6    interpreted those terms to require insurers to paid
 7    benefits on an expense-incurred basis and not to pay
 8    benefits to insureds in amounts greater than the
 9    medical provider agreed to accept as payment in full
10    for the services rendered.  The statute is based upon
11    the same legal and public policy considerations on
12    which the department has continuously relied in
13    interpreting actual charges.
14         The statute embodies the basic principle of
15    insurance that insurance is a contract of
16    indemnification.  That insured must suffer an actual
17    out-of-pocket loss to receive payment of benefits.  And
18    that actual charges insures that a few insureds do not
19    receive windfalls in the form of benefit payments
20    greater than sums actually paid to the health care
21    providers.  Such windfalls inevitably would cause
22    premiums to increase exponentially for all and would
23    restrict the availability and affordability of the
24    supplemental disease policies, to the detriment of the
25    citizens of this state.  And that statute requires
```

1  actual charges, from the date it was effective, to be

2  paid properly, according to the actual amounts the

3  doctors are being paid or they're entitled to accept as

4  payment in full.

5      That's what the settlement does.  To come in here

6  and argue that the settlement is somehow, you know,

7  harmful or is so bad that we can't have it apply to

8  South Carolina residents is ridiculous.  That's why the

9  South Carolina legislature passed a statute consistent

10  with the settlement.  And in fact, the argument can be

11  made that many of those policyholders will be better

12  off in the settlement because at least they'll be able

13  to get some compensation for the past benefits.  So

14  that is the Ward case.  It's been entirely overruled by

15  statute.

16      The second motion was a motion to extend the time

17  to opt out.  Well, the notice went out on May 14th in

18  this case.  The Ward case was in existence on May 14th.

19  The Ward case was in existence on June 28th, the opt-

20  out deadline.  They had no problem opting out their

21  clients.  They opted out their clients.  Mr. Hill,

22  Mr. Belue, the Little group, and several others.  I

23  believe they represented to the South Carolina judge

24  that they had opted out 45 South Carolina

25  policyholders.  So why are they in here now trying to

1   opt out the entire rest of the state of South Carolina,

2   who they don't represent and would have filed claims in

3   the settlement?  There is absolutely no basis for that

4   whatsoever.

5       Lastly, two of the individuals that Mr. Knie

6   mentioned, Stephen Hege, he filed a claim and he filed

7   an objection.  He's part of the settlement.  And the

8   last person was, I believe, Lillian Logan, who doesn't

9   even live in South Carolina, lives in the state of

10  Georgia, which also has a statute.

11      So we think both of these motions are not well

12  taken and should be denied.  This, I understand, is a

13  collection of the 45 opt-outs which Mr. Knie has

14  represented and has already opted out of this case,

15  I'll submit it to the Court.

16      MR. KNIE:  If I may respond briefly.  I'm sure

17  the Court noted that Mr. Leventhal, in saying that the

18  South Carolina statute has effectively overruled Ward,

19  failed to mention Judge Joseph Anderson's order finding

20  that in fact, the statute is prospective only.  So in

21  fact, it has not overruled Ward.  He knows it has not

22  overruled Ward.  And the judge was absolutely correct

23  in saying that it is prospective only and does not

24  apply to these class members.  So that statement is

25  incorrect, Your Honor.

```
 1          Yes, we did go procedurally in court in South
 2   Carolina and asked the Court to issue an injunction.
 3   The Court said, "Mr. Knie, you're in the wrong court.
 4   If you want to carve out the South Carolina class, you
 5   need to go to Little Rock, Arkansas."  And I said,
 6   "Yes, sir.  And I'm going."  And so that's the reason
 7   we're here, because Judge Anderson said I need to do it
 8   here.  Thank you.
 9          MR. BOHRER:  Your Honor, if I may.  Phillip
10   Bohrer for the plaintiffs.  I just want to make one
11   point, Your Honor, and that is this.  As we set forth
12   in our brief, Arkansas law, in the case of General
13   Motors v. Bryant, addresses the issue of differences in
14   state laws when evaluating, for certification purposes,
15   a nationwide settlement.  And the law in Arkansas is is
16   that variations in state law do not defeat
17   certification.  Arkansas courts are not required to
18   conduct a state-by-state analysis.  And the reason is
19   is because in settlement contexts, there are no
20   manageability presented with the differences between
21   state laws.
22          The basis of the settlement is to resolve the
23   litigation on a nationwide basis.  And the South
24   Carolina individuals who don't like the settlement have
25   an option, and that option is to opt out.  And in fact,
```

1 several have. Many have not. Many have filed claim

2 forms. Many have decided that they want to

3 participate. There is no defect in the notice. And

4 the settlement is consistent with Arkansas law, Judge.

5 THE COURT: The Court is going to deny the motion

6 for a subclass and deny the motion to extend the time

7 to opt out. I believe that's all the preliminary

8 issues we need to get out of the way before we move on

9 to the --

10 MR. BAKER: I think we're ready to proceed on the

11 fairness hearing, Your Honor.

12 THE COURT: All right. Let's do so.

13 MR. BAKER: Your Honor, today's proceeding falls

14 under Rule 23. This Court has been charged by the

15 Supreme Court, who creates all of our Rules for Civil

16 Procedure, with a process that is intended to give this

17 Court an assurance that the settlement that has been

18 brought before it is fair, reasonable, and adequate.

19 And that is the sole issue before this Court.

20 This proceeding today is not intended to be a

21 trial on the merits of the dispute between these

22 parties. We all know there is a dispute between the

23 parties, and we know that there are pros and cons to

24 the viability of the claims and the defenses. These

25 parties believe that settlement is appropriate. Your

```
 1    Honor has preliminarily approved it.  And now we move
 2    to the four standards that the Arkansas Supreme Court
 3    has announced in Ballard, which are to be used to
 4    review this settlement under Rule 23 standard of
 5    fairness, reasonableness, and adequacy.
 6         You will first hear from the plaintiffs and their
 7    arguments as to those -- satisfaction of the Rule 23
 8    standard.  You then will hear from the defendants.  I
 9    suppose then you will hear from those objectors who
10    have preserved their rights to present argument to this
11    Court.  And then finally, Your Honor, we intend to, as
12    a last item, take up the attorney's fee portion of the
13    proposed settlement.  And Your Honor, with that, I will
14    yield the floor to Mr. Bohrer.
15         MR. BOHRER:  May it please the Court, Your Honor,
16    as we told you when we were here the first time, we
17    think the record in this case clearly establishes that
18    your preliminary approval order was correct and that
19    the settlement is fair, it's reasonable, it's the
20    result of an arm's length negotiation between well-
21    informed counsel.
22         Ballard is the controlling case with respect to
23    the criteria that Your Honor needs to consider in
24    determining whether or not to grant final approval.  I
25    would like to address certain Ballard issues and
```

```
 1   Mr. Leventhal, I think, will also address certain
 2   Ballard issues.  The first, Your Honor, is whether or
 3   not the class representatives were adequate.  There
 4   have been some issues raised in some of these
 5   objections with respect to adequacy.
 6        Arkansas law states that to be an adequate class
 7   rep requires a very minimal bar.  It's easy to cross
 8   and it's easy to be adequate.  The use of the word
 9   "adequate" is intentional because perfection is not
10   required.  Adequacy is required.
11        Arkansas law requires, for a class rep to be
12   adequate, only a willingness to take time to meet with
13   counsel, to stay informed about the case.  You don't
14   need to remember all the details of the case.  You need
15   to have a basic familiarity about the case.  And you
16   need to do your job as a class rep.  We have submitted
17   affidavits from each of the class representatives that
18   we submit, Your Honor, establish that all of the class
19   representatives are adequate under Arkansas law.
20        Arkansas law further states that if a class
21   member -- a putative class member feels that a class
22   representative is not adequate, the option is to opt
23   out.  Several people in this case chose to opt out.
24   But that is the remedy.
25        With respect to each class representative, Your
```

1   Honor, each was either himself or herself a

2   policyholder or is a legal representative or surviving

3   spouse of a policyholder.  Some are currently in claim

4   status.  Each of the class reps have in the past been

5   in claims status.  Many are still paying premiums.  All

6   of them had past claims.

7        Although the class reps easily meet the adequacy

8   requirement -- and I know that there have been some

9   issues raised with respect to Mr. Pipes and Purifoy

10  based on the district court's ruling in the Pipes case

11  that they were not adequate.  A couple of points with

12  respect to the Pipes ruling, Judge.  Number one, it's

13  not a final determination.  At the time this case was

14  settled before Your Honor, there is still pending, and

15  there was at that time pending, a motion for

16  reconsideration of Judge Wright's ruling.  That motion

17  has not yet been decided.  Thus, the Pipes ruling is

18  not final and it's not binding.

19       Second, we respectfully submit, Judge, that Judge

20  Wright was just wrong.  She applied the wrong standard.

21  And the federal standard is more stringent than

22  Arkansas' state standard.  First, she was wrong with

23  respect to Pipes not being a class member.  Under the

24  terms of the policy, the benefits owed to the deceased

25  spouse clearly accrue to the surviving spouse.  So

1    Pipes is a class member.  Secondly, Purifoy certainly

2    meets the Arkansas requirements with respect to the

3    level of knowledge necessary.

4        Under any circumstance, Judge, even if Pipes and

5    Purifoy were not adequate class representatives, we

6    still have five other class representatives whose

7    affidavits clearly establish that they are adequate

8    under Arkansas law.  So with respect to that component,

9    Judge, we respectfully submit that the class

10   representatives are adequate under Arkansas law.

11       Next, Your Honor, with respect to whether class

12   counsel is adequate, each of the three proposed class

13   counsel in this case have submitted affidavits with

14   respect to the work they've done in this case and their

15   CVs that outline the nature and extent of their

16   litigation and experience.  Not only with this type of

17   litigation against Life Investors and other insurance

18   carriers with respect to actual charge cases, but with

19   respect to the both complex and class litigation

20   nationwide.

21       Briefly, Your Honor, class counsel in this case

22   have had extensive experience in both arenas,

23   especially with respect to the actual charges

24   litigation in various states around the country.  The

25   CVs, Your Honor, establish that -- and the affidavits

1   establish that class counsel is adequate under Arkansas

2   law.

3       Now, addressing a couple of the Ballard factors,

4   again, I will be the first to admit, Judge -- and I

5   admit today, that on an individual basis, an individual

6   plaintiff may very well be able to go to trial and get

7   a judgment that contains punitive damages that may be

8   far in excess of what he or she will receive under the

9   terms of this settlement.  There is no doubt that on an

10  individual basis, that may occur.  There is also no

11  doubt that on an individual basis, plaintiffs may go to

12  trial and get zero.

13      Thus, Judge, this case presents classic

14  litigation risk analysis and justifies some concessions

15  on both sides with respect to litigation risk factors.

16  Fortunately, Judge, the law does not require Your Honor

17  to consider what judgment value would be in this case.

18  It requires you to consider whether or not the

19  settlement is fair and reasonable and whether it was

20  arrived at by an arm's length transaction.

21      So with respect to Ballard factor number one, the

22  strength of the case for the plaintiffs on the merits

23  balanced against the amount offered in settlement,

24  there are some things to consider.  Litigation risk

25  factor number one, Judge, and perhaps most importantly,

1    is whether or not a class action could be certified

2    either on a state-by-state basis or on a nationwide

3    basis.  And what's interesting about that, Your Honor,

4    is that what we learned in the settlement process is,

5    there are about 5800 potential past claimants.  Folks

6    who had claims for cancer and were paid benefits.

7        But across the landscape, at the time the case

8    was settled, there were only about 19 lawsuits pending

9    in various forms, individual or class actions.  It

10   means that of the universe of potential plaintiffs, not

11   many people had asserted their rights.  The inference

12   may be that they were quite happy with the way the

13   adjusting practices took place.

14       The litigation landscape and decisions with

15   respect to class certification are very telling.  As

16   this Court knows, and everyone here knows, we attempted

17   to certify the Pipes case and we did not win.  I

18   believe Metzger was certified by the district court and

19   reversed on appeal.  There were three courts that have

20   denied certification.  In the Ward court, as I

21   understand it, certified a statewide claim, but it's on

22   appeal.

23       And the reason that's important is this, Judge.

24   Because if you can't certify a case, then all of the

25   putative class members ultimately recover nothing

```
 1    because there is no vehicle by which the putative class
 2    members can progress and assert their claims.  And
 3    given the virtual nonexistence of litigation by the
 4    past claimants, the class vehicle obviously is an
 5    important way, and perhaps the only mechanism by which
 6    putative class members can be compensated.
 7         So as class counsel and as a plaintiff lawyer who
 8    does complex litigation, I have to decide and my co-
 9    class counsel have to decide, what is the litigation
10    risk factor of an adverse ruling on class
11    certification.  Well, here it's significant because if
12    a class is not certified, then there are thousands of
13    individuals who will never be compensated.  The statute
14    of limitation runs.  They don't assert their claims.
15    And their rights are forever lost.
16         And the only way in which this can be looked at
17    objectively and empirically is to look at the
18    litigation landscape.  And the only conclusion that can
19    be drawn is that it is a significant litigation risk.
20    And it justifies concessions off of the nirvana number
21    of a judgment value because these guys over here won't
22    pay it because they know that in a litigation risk
23    dynamic, they may win on class cert.  And if so, they
24    have very little exposure.  That is one factor that
25    mitigates in favor of the settlement.  Because without
```

34

```
 1    the certification, many, many people basically will not

 2    have any recovery.

 3         The next litigation risk discount, Your Honor,

 4    is, what will the plaintiffs get on the merits.  Again,

 5    I am conceding for everyone here that individual

 6    plaintiffs may get more.  They may get less.  Metzger

 7    is an example is someone who got more.  But the Metzger

 8    facts don't necessarily exist in this case.

 9         Interestingly, in Metzger, the plaintiff's

10    counsel in that case smartly brought in an insurance

11    executive in an orange jumpsuit and handcuffs and asked

12    whether or not he had received a bribe from the

13    defendant in that case.  And of course, he took the

14    Fifth Amendment, and obviously the jury wasn't happy.

15    So a big punitive damage award was entered, but it's an

16    aberration, Judge.  And I will tell you that I don't

17    think those facts exist in this case.  If you look at

18    the litigation landscape and litigation history with

19    respect to actual charges against Life Investors and

20    others, it's a mixed bag again.

21         With all due respect to my fellow attorneys from

22    South Carolina, I'm not sure where that decision goes

23    on the merits in Ward.  I suspect that if it's

24    litigated, it's going to get appealed and the outcome

25    is uncertain.  It's uncertain across the universe,
```

```
 1    Judge, because some cases have ruled that actual
 2    charges means the amount the physician or health care
 3    provider accepts as payment in full.  Others say it's
 4    ambiguous.
 5          The problem with the finding that it's ambiguous,
 6    which is what happened in the Guidry case down in
 7    Louisiana, is that it doesn't necessarily, in all
 8    situations, default to a plaintiff victory.  In fact,
 9    in Guidry, what happened was was that the Court said,
10    "Look, it's -- the two interpretations are co-equal.
11    I'm remanding to the state court -- I mean, to the
12    district court to determine how it's going to be
13    interpreted."  And it creates an interesting class
14    certification issue.
15          The issue is, Judge, that if the term is
16    ambiguous and if a district court, in deciding the
17    meaning of actual charges, is going to consider parole
18    evidence or testimony on the intent of the parties,
19    we're back to you can't certify.  And you can't certify
20    because you have to then take evidence of what the
21    transaction and history was between the sales person
22    who sold the policy and the buyer.  And it's an
23    individualized inquiry that results in predominant
24    individual issues and not predominant common issues.
25    You can't have mini trials on what this means in a
```