# EXHIBIT 18, Part 2 of 4

1    transaction in a class action.

2         And so I had to look at this and say, you know,

3    this is another hurdle to class certification.  It's

4    also a hurdle on the merits.  Courts have been all

5    over.  And it's uncertain whether plaintiffs across the

6    land will win.  With all due respect, some might and

7    some may not.  And so that, again, Your Honor, is a

8    litigation risk discount.

9         Some of the other factors that we had to consider

10   were, the past claimants obviously have cancer.

11   Obviously that is a health risk.  And with respect to

12   final resolution on an immediate basis as opposed to

13   years of prolonged litigation, we viewed it as a

14   significant benefit to have these issues resolved now,

15   to get people money, as opposed to litigating a case

16   that may not be certified and may not be over for years

17   to come.

18        So with respect to what is the value of the

19   settlement, Mr. Leventhal is going to address that in

20   detail.  But I want to make this point.  What the

21   settlement offers is this.  It offers 40 percent of the

22   difference between the billed amount, the high number,

23   and what the physician will take, the low number,

24   capped at $15,000.  Well, you know, look, during the

25   negotiation process, I tried to get concessions for

1   more money and I tried to get concessions of no caps.

2   They wouldn't do it.  It was a concession we had to

3   make.

4        But what it really means is this, and the

5   evidence in the briefing supports this, that the cap

6   doesn't affect approximately 80 percent of the past

7   claimants.  And what that means, Judge, is that with

8   respect to that 80 percent of the past claimants who

9   participate, who will receive the full 40 percent,

10  which is equal to or less than $15,000 of the

11  difference, that is, in essence, two-thirds of their

12  judgments value of the difference without regard to

13  whether they get punitive damages or not.

14       A simple example is this.  If the difference was

15  $10,000, under the settlement, you get 4-.  If the

16  difference was $10,000 and a class member hired me and

17  I litigated that case and won and got $10,000, but that

18  client had to pay me 40 percent for fees and costs, the

19  net proceeds is 6-.

20       So when you consider immediate no-risk resolution

21  at 4,000 versus risk and delay to get 6-, if you can

22  get two-thirds of judgment value today without risk,

23  that's a pretty good result compared to what a possible

24  judgment value would be.

25       And so I submit, Your Honor, that under Ballard

```
 1    factor number one, with respect to over 80 percent of
 2    the past claimants, their recovery under the settlement
 3    is equal to two-thirds of the judgment value, without
 4    punitive damages or bad faith or penalty money, that
 5    they would get if they litigated this case privately.
 6    And when you factor in litigation risk analysis
 7    discounts, two-thirds of judgment value for 80 percent
 8    of the class as a whole is a really good recovery in a
 9    contested piece of litigation.
10         Now, we understand that there are certain people
11    who have high dollar claims that the $15,000 cap
12    affects, and we recognize it's about 20 percent of the
13    class.  The settlement is clear.  The notice was
14    unambiguous that there was a cap.  And with respect to
15    those 20 percent, we negotiated a very high opt-out
16    tolerance because we believed that those individuals,
17    if they so chose to do it, would opt out.
18         And maybe they should opt out.  Some of them may
19    have opted out.  But the point is is that many of these
20    individuals did not dispute the way their benefits were
21    paid, had no beef with the company, and wanted to stay
22    in the settlement.  Now, Your Honor, the law in
23    Arkansas, I think, and everywhere it's fairly clear,
24    that the Court should not consider judgment value,
25    should not consider punitive damages in assessing
```

 1   fairness and reasonableness.

 2        The other major factor, Your Honor, that I

 3   believe the Court shall consider was really well

 4   articulated in two documents that were attached, I

 5   think, to our brief, or to Life Investors' brief.  And

 6   that is the district court's rulings in Skelton and

 7   Robertson with respect to fairness.  Very long detailed

 8   rulings following fairness hearings.

 9        And Judge Wright also captured this, as well as

10   the district court in Metzger, and as well as the

11   recent case -- what's the name of that case in

12   Philadelphia?  Is it Smith, that just denied cert?

13   There is an issue, Judge, that needs to be addressed in

14   -- and needs to be considered when deciding what is

15   best for not just the past claimants, but -- and this

16   is what is really important -- the class as a whole.

17        And the issue is that if you take the myopic

18   view, Your Honor, that this litigation is focused

19   solely on past claimants, then you're going to drive

20   the bus off the cliff, and the results are going to be,

21   as the Robertson court described, catastrophic for the

22   entire class, and this is why.  The more benefits are

23   paid out, the higher premiums go.  It is the crux of

24   why this settlement is fair and reasonable to the class

25   as a whole.

1    Mr. Leventhal is going to address this issue in

2    detail and advise the Court of the premium dollar

3    savings that the class as a whole will reap from this

4    settlement.  And the reason is is that moving forward,

5    with benefits being paid consistent with the current

6    adjusting practices -- and that is, the amount paid in

7    full -- it is estimated that the class as a whole, over

8    the next 10 years, will save $135 million in premiums.

9    Now, if this litigation was only about past

10   claimants, which it is not, that $135 million premium

11   savings is off the table.  A few people will benefit

12   because they're -- a few people will benefit because of

13   the amount that they will recovery if they are stricken

14   with cancer, will go up.  But the net catastrophic

15   effect is is that the policy book of business as a

16   whole goes from here to here.  It shrinks

17   significantly.  The lapse rate goes off the chart.  And

18   obviously, no one has affordable insurance and

19   ultimately, the book of business can't sustain a loss

20   ratio that is acceptable.  And that's simple math,

21   Judge.  The more you pay out, the higher the premiums

22   go.

23   If you look at Robertson and you look at Skelton,

24   this issue was addressed in great detail.  And those

25   courts concluded, and what we're asking Your Honor to

1    conclude is, is that this settlement provides really

2    the only rational, reasonable balance between past

3    claimants who want money and premium payers who pay

4    into the system to pay people who get cancer.  Any

5    other way that this litigation would be resolved,

6    especially if it would be resolved requiring the

7    defendant to pay the higher amount, is going to result

8    in unsustainable policy lapses.

9        So we had to consider all of this.  And I think

10   all of these are litigation risk factors and practical

11   factors, Your Honor.  Practical factors that the

12   Robertson court and the Skelton court really focused on

13   and we urge Your Honor to focus on in determining that

14   when you look at the strength of the case for the

15   plaintiffs on the merits balanced against the offers

16   made in the settlement, then you will understand, as I

17   believe you do, and that Your Honor will rule that the

18   settlement is fair and reasonable and actually does

19   balance the interests of the past claimants with the

20   premium payers.

21       Ballard factor number four, Your Honor, is the

22   amount of opposition to the settlement.  Well, there

23   were over 250,000 putative class members, who are now

24   actual class members who received notice.  That's a

25   pretty big number.  As we sit here today, according to

1     our count, there are about 11 objections.  Many of them

2     are by objectors who are represented by counsel who

3     have competing claims.  I've been in that situation.  I

4     understand the objections.  But it's a paltry number,

5     Judge.  There were only 476 opt-outs, 10 percent of

6     them represented by counsel.  It's an insignificant

7     number.

8          The law is pretty clear that you can make some

9     pretty good assumptions and inferences from the lack of

10    opposition.  And we would submit, Your Honor, that the

11    lack of opposition in this case is, in essence, a clear

12    message from the class that they like this settlement

13    and they like it for a number of reasons.  Number one,

14    because it ensures lower premiums and affordable

15    coverage for those class members who are not in claim

16    status.  And number two, the vast majority of those

17    class members who are in or were in claim status don't

18    disagree with it because they either accept the

19    company's adjusting practices as correct or understand

20    that in order to keep these policies financially

21    viable, this is the way it needs to be.  It's

22    especially true, given the fact that the litigation

23    history has been relatively sparse, considering the

24    number of past claimants.  So Your Honor, we would

25    submit that Ballard factor number four weighs heavily

1   in favor of approval of settlement.

2       Shifting gears slightly, Your Honor. Some of the

3   objectors have raised this issue, and I want to address

4   it not only in anticipatory response, but also as part

5   of the fairness hearing. There was no fraud. There

6   was no collusion. There was no reverse auction,

7   period. It does not exist.

8       How can you tell, especially in a case that

9   appears before Your Honor without a long litigation

10  history? Well, you can tell in a number of ways.

11  Number one, look at plaintiff counsels' CVs. Look at

12  plaintiff counsels' affidavits. Look at our

13  submissions. You can see, Your Honor, that we've been

14  involved in really fairly unpleasant, noncordial

15  litigation with defense counsel for now about two and a

16  half years.

17      Look at the docket sheet from the Pipes case

18  before Judge Pipes -- before Judge Wright. We did an

19  adequate amount of discovery. We litigated this case

20  on five or six fronts. We were the first to tee up the

21  class cert against Life Investors, and we didn't win.

22  But we were pretty far along and pretty well knew what

23  the landscape was.

24      Look at the chronology of how this deal was

25  reached. The first time we ever met with defense

1   counsel was on October 6, 2008, in New Orleans, well

2   before the Pipes ruling, which came out, I think, on

3   November 25th, 2008.  We mediated this case for two

4   days before a retired federal judge on November 20th

5   and November 21st down in Florida, again, before the

6   Pipes ruling came out.

7       Negotiations were fairly mature and well on their

8   way.  And, you know, during these negotiations, I had a

9   pretty good wish list of things I wanted.  I couldn't

10  make them pay.  The mediator couldn't make them pay 100

11  cents on the dollar and freeze premiums.  We're all

12  back to litigation risk discount.  We all had to make

13  concessions.

14      And Judge, maybe they can address this.  But I

15  suggest that the reason that the defendants chose our

16  firms to negotiate with was not because there was some

17  reverse auction dynamic and not because the Pipes case

18  some kind of way weakened our position, but because we

19  had more cases that were more advanced.  We represented

20  more people around the country than any other lawyer in

21  this litigation against Life Investors.  We presented

22  the greatest risk to them.

23      Even after the Pipes case, I remember telling

24  Mr. Leventhal, "All right.  You got one.  Maybe you'll

25  win it, maybe you won't," because I felt pretty good on

```
 1    appeal that Judge Wright was just wrong.  No pun
 2    intended.  But we also had other cases that we were
 3    ready to tee up for class certification.
 4         And to his credit, Mr. Leventhal conceded that,
 5    you know, the Pipes ruling was not the end of the
 6    litigation road.  This case was not finished in terms
 7    of a agreed-upon settlement until, I want to say, March
 8    or February of 2009.  That's about six or seven months
 9    of pretty hard-fought negotiations.  We had another
10    face-to-face negotiating session, I think, on
11    January 2nd, 2009, in Florida.
12         These were hard negotiations, Judge.  It was a
13    mediated case.  The mediation didn't work.  Both sides
14    were entrenched.  Both sides dug in.  This is the
15    epitome, Your Honor, of an arm's length transaction by
16    knowledgeable, well-informed, experienced counseling.
17         There was no reverse auction because we were the
18    only firm, to my knowledge, that was involved in the
19    negotiations.  And we submit, Your Honor, that the
20    settlement has a presumption of fairness and a
21    presumption of reasonableness under the law because it
22    was the result of arm's length negotiations by
23    experienced counsel.
24         Your Honor, there is some other pending motions
25    for fees and costs, but I suspect that that should
```

```
 1   wait, with Your Honor's permission, until after the
 2   fairness hearing.  I may have some additional substance
 3   to add, but I would like to tender the floor to
 4   Mr. Leventhal unless Your Honor has any questions.
 5        THE COURT:  Not at this time.
 6        MR. BOHRER:  Thank you, Your Honor.
 7        MS. McCABE:  Your Honor, may I approach?
 8        THE COURT:  Sure.
 9        MR. LEVENTHAL:  Good morning, Your Honor.
10   Markham Leventhal from the Jorden Burt Law Firm on
11   behalf of the defendants.  I'd like to spend a little
12   bit of time on the background of the dispute and the
13   facts and the -- really, also the background of the
14   litigation leading up to the settlement.
15        The Court has heard some of this before, but I
16   want to -- I want to make sure that the Court, as it
17   evaluates this settlement, really understands the
18   nature of the policies, the nature of the dispute, and
19   the nature of the litigation.  As the Court is well
20   aware, the settlement involves cancer policies,
21   sometimes referred to as specified disease policies.
22   And these policies generally pay benefits directly to
23   the insured.  They're a type of health insurance
24   policy.  And they pay those benefits even if the
25   insured is covered by another health insurance policy,
```

1   is covered by Medicare.

2       And most of the benefits in the policies are sort

3   of noncontroversial.  They pay specific amounts, $100 a

4   day in the hospital, $150 a day for a lab test, X

5   dollars for certain, you know, types of surgeries.  And

6   some of the benefits are paid based upon the actual

7   charges for the services rendered.

8       And there are really four types of actual charges

9   benefits in these policies.  One is chemotherapy.

10  Radiation therapy is another.  Blood work, and then an

11  ambulance service.  Chemotherapy and radiation therapy

12  are the more significant items.

13      So what are the actual charges?  I mean, that's

14  what all this comes down to.  And when these policies

15  were originally issued over 30 years ago now in the

16  '70s, it wasn't a difficult question because doctors

17  were sending out bills.  Patients were paying the

18  bills.  Patients were taking the copies of the bills,

19  sending them in to the insurance company, and we were

20  paying the amount that was being billed and the amount

21  that the doctors were being paid.

22      So what happened?  Fast-forward a couple of

23  decades.  And a lot of this, by the way, is covered in

24  one of the expert affidavits in the record.  The expert

25  affidavit of Professor Glenn Alan Melnick, who is the

1  current Blue Cross of California chair at the

2  University of Southern California. He's one of the

3  leading experts on health care issues in the country.

4  And he talks about the changes in health care billing

5  practices over time.

6      And hospitals in particular, and also, in today's

7  world, pretty much all physician groups began to

8  develop a second set of prices. And we know today that

9  all hospitals have what is called a charge master.

10  What is a charge master? It's basically a maximum

11  price list.

12      The thing about it is, though, that nobody

13  actually really ever pays the prices on those lists.

14  Those list prices are dramatically inflated, and let me

15  give you one example. We had a insured who went to the

16  hospital for 33 days. Now, the person was covered

17  completely by a Blue Cross plan, so didn't pay any

18  money for the hospital stay or any of the medical

19  expenses, and never got a bill.

20      So what did he do? He went to the hospital and

21  he said, "Can you give me a computer printout of, you

22  know, all the services that you have performed during

23  the last month or so?" And they gave him about 100

24  pages of computer printout that had all the services,

25  and all of their list prices added up to $540,000, over

```
 1    half a million dollars.  He took that 100 pages,
 2    submitted it to Life Investors and said, "Pay me the
 3    actual charges."  Now, again, the policy only pays
 4    actual charges for certain things, chemotherapy,
 5    radiation therapy.  But the point is, he used that
 6    computer printout calling it a bill, asking the company
 7    to pay the actual charges for the items that were
 8    covered based on those list prices.
 9         Well, what were the actual charges?  It turns out
10    the hospital actually got paid $67,000 for that entire
11    hospital stay, not over half a million dollars.  The
12    list prices were over eight times the amount that was
13    actually being charged and paid in that particular
14    case.  Now, that is an extreme example.  But it's not
15    uncommon for list prices to be double, triple, five
16    times the amount that the actual doctors are being paid
17    and collecting and agreeing -- they've agreed to accept
18    as full payment for their services.
19         So what happened here?  How did we develop all
20    this litigation?  Why are the list prices even
21    important?  Because these policies are subject to
22    premium rate increases, just like other health
23    insurance policies.  And in the year 2004, the company
24    had just filed for a 30 percent rate increase across
25    the board, and was projecting that based upon what was
```

```
 1    happening here, they were going to have to increase
 2    premiums 30 percent a year pretty much off into the
 3    future, as far as the eye can see.  And they said,
 4    "What is going on here?  Why do we need to increase
 5    premiums like this?" So they started an investigation.
 6         They looked at all the policies and they
 7    discovered that the insureds were submitting statements
 8    like this computer printout that were not really bills,
 9    and that the company was overpaying the benefits for
10    actual charges.  It wasn't paying the actual amount
11    that was being paid to the doctor, that was being
12    charged.  And it wasn't being -- paying the actual
13    amount that, in most cases, were the legal limit of
14    what the doctor could charge.
15         For example, in Medicare.  As a matter of federal
16    law, the doctors cannot bill or charge over a certain
17    amount.  Yet the company was paying, in many cases,
18    more than that amount because insureds were submitting
19    statements or documents showing these list prices.  In
20    many cases, these documents would say right on them,
21    "This is not a bill."  But the company was accepting
22    them in error.
23         So what was to be done about this?  There was
24    unanimous agreement amongst the people looking at this
25    that the company was overpaying the benefits, that it
```

1  was committing error because these policies insure for
2  loss incurred.  They pretty much equate actual charges
3  with expenses, and these were not real expenses.  They
4  were not real losses incurred.

5      So the issue became, "Are we going to continue to
6  increase premium rates for the policyholders as a
7  whole, you know, for eternity?  What is going to happen
8  to the policyholders?  How are they going to be able to
9  afford this?  Or do we correct what we believe is a
10 plain error?  How do we correct it?"  Well, we would
11 have to send notice to the policyholders.  We would
12 have to tell them to submit the right kind of
13 documentation when they're filing claims.  And that's
14 what the company did.

15     The company decided in 2005 that it was going to
16 correct the procedures.  It sent out a letter in early
17 2006, and a copy of this letter is in the record.  It's
18 attached to the affidavit of Connie Whitlock, I
19 believe, as Exhibit G.  It's also cited in our brief.
20 And it's no secret the letter went out to the
21 policyholders.  It explained plainly what list prices
22 were.  It said the company does not consider list
23 prices to be the actual charges.  And it said that
24 going forward, please submit the proper documentation
25 to show what the actual charges are, what is actually

1    being paid to these doctors.  And a letter also

2    included new claim forms, instructions, and then gave

3    advanced notice.  It didn't say this was going to take

4    effect immediately.  It said it was going to take

5    effect in April or May of 2006.

6         So in April or May of 2006, this correction to

7    the claims procedures took effect.  And that's what

8    everybody is complaining about in all of this

9    litigation.  They're saying the company didn't have the

10   right to correct its claim forms and procedures, that

11   actual charges should really continue to mean list

12   prices, and that's what the litigation mostly is about.

13        The policyholders as a whole, most of them didn't

14   complain about the letter.  They got the letter

15   explaining what actual charges meant, and we believe

16   that most of them agreed with the letter.  Plaintiffs'

17   lawyers don't agree with that.  Who did complain?  The

18   people that complained primarily were the people who

19   had already been overpaid list prices, and they wanted

20   to continue to get as much money as they could.  They

21   wanted to continue to be paid more than their doctors

22   were being paid.  And they said, "You paid me this way

23   already, so you have to continue paying me this way.

24   And it doesn't matter if it's wrong.  And we think

25   actual charges is ambiguous.  And if it's ambiguous,

1    then it should be construed against the insurance

2    company." And that, in a nut shell, is what the claim

3    is made in almost all of these lawsuits.

4        Now, I said that most of the policyholders did

5    not complain about the letter or the change, and that's

6    true. Out of the 250,000 notices that were sent out, I

7    believe in one of the affidavits, possibly the

8    affidavit of Stephen Goodwin, the number of past

9    claimants is 5,825. So out of the 25,0000 settlement

10    class members, 5,825 are people who, after April or

11    May 1st of 2006, had some claims paid for actual

12    charges benefits from that date up through the date of

13    this Court's preliminary approval order.

14        There was an objection sent in by a woman named

15    Audry Hunter, and that objection is quoted on page 57

16    of our brief. And it says, "I have no objection with

17    the plan paying actual charges for medical services

18    according to one of the proposed settlement features.

19    This seems fair and reasonable. But constant increases

20    in premiums is not fair and reasonable." She's saying

21    she has no problem being paid under her policy

22    according to how actual charges is defined in the

23    settlement, but her problem is the premium increases.

24    And I think that's telling. So we went over who the

25    policyholders were that did complain. Let's talk about

```
 1    the litigation that ensued.
 2         In 2007, there were three class actions filed.
 3    One of those class actions was the Pipes case here in
 4    the Eastern District of Arkansas, filed before Judge
 5    Wright.  Then there was a case called Gooch in
 6    Tennessee.  There was a case called Smith in
 7    Pennsylvania.  All the cases pretty much argued the
 8    same thing, actual charges, you know, should mean list
 9    prices.  Of course, they don't like to call them list
10    prices.  They like to say the billed amounts.  We like
11    to say -- calling them billed amounts when they're not
12    really billed is a little bit inaccurate.  And to this
13    day, we still disagree with that.
14         So we have the Gooch case, we have the Smith
15    case, and we have the Pipes case.  At a time when there
16    were, I think, seven total cases, we filed a motion
17    before the federal judicial panel, a multi-district
18    litigation.  We asked for all the cases to be
19    consolidated here before Judge Wright.  The plaintiffs
20    in the Gooch case and Smith case adamantly opposed
21    that.
22         Now ironically, they didn't want to consolidate
23    the cases so they'd all be together and perhaps the
24    settlement would have included everybody, but they
25    wanted to stay separate.  Now, ironically, they're
```

 1  doing everything they can to stop the settlement.  Now,

 2  class counsel in this case file a bunch of additional

 3  cases.  Pipes was their first case.  They filed a total

 4  of six cases.  They had four class actions.  They had

 5  two class actions in Arkansas besides the one before

 6  Judge Wright.

 7       They had another one against Transamerica before

 8  Judge Hendren.  They had a case -- a class action

 9  before Judge Tarnow in Michigan.  They had another

10  class action in Mississippi before, I believe, Chief

11  Judge Wingate.  And they had two cases in Louisiana

12  that at any time, they could have converted into class

13  actions.

14       So the point is that these lawyers, who we

15  ultimately settled with, had more cases than anybody

16  else.  They had more class actions.  And as they said,

17  their case before Judge Wright was far more advanced

18  than anybody else.  So naturally, we went to them to

19  talk about settlement.

20       Does that mean there was collusion or a reverse

21  auction or any kind of -- no, it doesn't.  And we've

22  been over the arm's length nature of the discussions in

23  this case.  You don't mediate before one of the leading

24  class action mediators in the country, Judge Politan,

25  former district judge from New Jersey, if you're

```
 1    planning to come up with some sort of collusive
 2    settlement.
 3         So we've been through the negotiations.  Let me
 4    outline some of the terms of the settlement.  There are
 5    three types of monetary benefits in the settlement.
 6    And when I'm done, Ms. McCabe is going to come out and
 7    go through the value of the settlement.
 8         The first is for past claimants.  We talked about
 9    past claimants.  Who are they?  Those are the 5,825
10    people who had some claims for actual charges from May
11    or April of 2006 through the date of this Court's
12    preliminary approval order.  They were entitled to file
13    a claim and they would, as Mr. Bohrer said, receive
14    40 percent of the difference between the list price and
15    the actual charges, pretty much no questions asked.  We
16    didn't require them to certify in their claim form that
17    they disagreed with our interpretation of actual
18    charges.
19         We didn't require them to certify when they
20    bought the policy, they thought actual charges meant
21    list prices.  We didn't do any of that.  We wanted to,
22    but we compromised.  All they had to do was file a
23    claim.  They will get a check for 40 percent of that
24    difference up to $15,000, which doesn't kick in until
25    that difference is $37,500, because it's 40 percent of
```

```
 1   $37,500 equals 15,000.  So you have to have a pretty
 2   big differential before that cap even comes into play.
 3   And when we figured it out, we had estimated that
 4   88 percent of the settlement class would be unaffected
 5   by that cap.
 6        I believe now, based upon the claims that were
 7   filed, it's about 80 percent.  So the vast majority of
 8   those past claimants were not even affected by that
 9   cap.  File a claim and get a significant check.
10        Now, I have seen pleadings in other cases, and
11   maybe even some of the objections in this case,
12   referring to that as pennies on the dollar.  Now, that
13   is just absurd.  I mean, getting a check for -- this is
14   not a coupon settlement.  This is real money.  File a
15   claim, and you get a check for 40 percent of the amount
16   in dispute and you don't even have to say it is
17   disputed.  So I don't need to spend any more time on
18   that.  Ms. McCabe will go over the value of that
19   particular benefit.
20        There is two other types of monetary benefits.
21   There is a $1,000 benefit for former cancer
22   policyholders.  These are policyholders that aren't
23   policyholders anymore.  They don't even have a policy
24   anymore.  But we provided in the settlement that they
25   could file a claim for a $1,000 benefit.  And at any
```

```
 1   time over the next 10 years, even if they had cancer
 2   already, if they have a subsequent treatment for
 3   cancer, or even if they didn't have cancer, if they
 4   were diagnosed for cancer anytime over the next 10
 5   years, they can get a check for $1,000.
 6       And the last type of benefit ia a $500 benefit
 7   for people who are deceased.  Deceased former
 8   policyholders, to the estates of those policyholders.
 9   They no longer have a policy and they passed away.
10   Those are the three types of cash monetary benefits in
11   the settlement.
12       I'd like to -- I think this would be a good time
13   to do a little comparison between this settlement and
14   the two settlements that Mr. Bohrer mentioned on cancer
15   policy cases that have already been finally approved by
16   other courts.  And those are the Robertson settlement
17   and the Skelton settlement.
18       THE COURT:  Mr. Leventhal, before you do that, I
19   was going to take a break at 10:30.  Is this a decent
20   time to do that?  I think I have somebody that's
21   waiting on an order out there.  So we're going to
22   break.
23       MR. LEVENTHAL:  This would be an excellent time
24   for a break, Your Honor.
25       THE COURT:  All right.  Court will be in recess
```

 1  until 10:45.

 2                    (Recess.)

 3       THE COURT:  We are back on the record.  Thank

 4  y'all for your patience.

 5       MR. LEVENTHAL:  Your Honor, I'm going to finish

 6  summarizing the settlement benefits before I move on to

 7  this comparison of the other actual charges

 8  settlements.  We talked about the monetary relief, the

 9  three forms of the monetary relief.  And there are also

10  some components of nonmonetary or injunctive relief.

11       The biggest item that's a point of contention

12  seems to be the actual charges injunction, which

13  resolves the ambiguity that's present in all these

14  cases and resolves it in a way consistent with five

15  different state statutes.  The injunction says that the

16  company, going forward, will pay the actual charges in

17  the amount equal to what is really owed either by

18  operation of law, by agreement, or whatever, whatever

19  is actually owed to the doctors and is accepted by the

20  doctors as payment in full for whatever services they

21  render.  So we're referring to that as the actual

22  charges injunction.

23       There are several other forms of injunctive

24  relief.  There is a provision that freezes the premium

25  rates for one year, and there is also a provision that

```
 1    triples certain lifetime benefits.  Some of the
 2    policies have a lifetime cap on the total amount of
 3    benefit that can be paid out for chemotherapy or
 4    radiation therapy.  The settlement reforms the
 5    contracts to automatically triple those lifetime
 6    maximums.  And Ms. McCabe is going to go through a
 7    valuation of those various forms of relief.
 8         A few points on the actual charges injunction.
 9    This is a key provision obviously, and it's amazing how
10    this has been mischaracterized.  First of all, this
11    provision is going to save the policyholders over
12    $100 million of premium increases over the next 10
13    years.  So the idea that the injunction somehow harms
14    the policyholders just cannot hold any water.
15         Secondly, you know, one of the factors the Court
16    is considering is whether the settlement is reasonable.
17    Well, a provision that pretty much parallels a statute
18    enacted by five different states, which those state
19    legislatures have found good enough to become the
20    public policy of those states, can hardly be argued as
21    unreasonable.
22         And indeed, we went over this before, so I don't
23    need to repeat it, in some of the earlier motions.
24    What happened in the state of South Carolina is telling
25    with the Ward case, because the Ward case was decided.
```

```
1   The South Carolina Department of Insurance said, "This
2   is totally out of whack with the way we've defined
3   actual charges for the terms of three past insurance
4   commissioners," and supported a statute and had the
5   Ward case legislatively overruled.
6        So let's move now to a bit of a comparison.
7   We're fortunate because there have been two other
8   actual charges settlements out there.  And I have a
9   chart here entitled "Cash Payment Comparison."  The
10  first two columns are those other two settlements.
11       The first settlement is called Robertson v.
12  Liberty National.  It's a class action settlement in
13  the state of Alabama.  It was finally approved.
14  Counsel in that case was the Beasley Law Firm, who
15  happen to be counsel to Mr. Gooch, co-counsel to
16  Mr. Gooch in Tennessee.  What did they pay the past
17  claimants?  They paid them zero.  They had no payment
18  for any of the past claimants.
19       All they did was enact an actual charges
20  injunction exactly like the one in this case, yet we've
21  seen countless pleadings attacking this settlement,
22  attacking the injunction as ratifying a breach of
23  contract, outrageous, harming the policyholders.  And
24  yet the co-counsel for Mr. Gooch did the exact same
25  thing in the Robertson settlement.
```

```
 1         Now, I've probably filed half a dozen briefs,
 2    whether it's been the 6th Circuit or Tennessee,
 3    whatever, pointing that out.  You know, these same
 4    lawyers who are arguing this settlement is so, you
 5    know, horrible had the same injunction in their
 6    settlement.  And what response did we get?  Nothing.
 7    Not one response.  Just totally ignored in half a dozen
 8    briefs because there is no response.  So this
 9    settlement has been finally approved, final judgment
10    entered.  It had no benefit for past claimants.  And it
11    had the same actual charges injunction.
12         The Skelton settlement is a case called Skelton
13    v. Central United Life Insurance Company.  Central
14    United has probably had more actual charges litigation
15    than any company in the country.  And they had a
16    settlement not too long ago, and it also had some past
17    claimant relief.  They capped the relief at $5,000, and
18    they paid 30 percent of the actual amount paid as
19    benefits.
20         Our settlement is a cap of $15,000.  We already
21    went over it.  It doesn't affect 80 percent of the
22    policyholders.  And it is significantly more than
23    either of those two settlements, both of which have
24    been finally approved.
25         I have another chart which summarizes all three
```

settlements.  This is a comparison on a line item by
line item basis for Robertson, Skelton, and our case
here, Runyan.  The actual charges injunction, all of
them had it.  Why?  Because as Mr. Bohrer said, it's
the only reasonable way to settle a case like this.
It's the only way that you can balance the interests of
the policyholders who are concerned about having their
premiums raised and those that want to be paid, you
know, list prices.

You have to have a compromise.  Otherwise, it
just cannot possibly work.  And that's the reason why
all these cases have denied class certification.
That's the reason why -- one of the reasons Judge
Wright denied class certification, because there is a
conflict of interest between the class.  There is a
small group of policyholders who want to be paid list
prices, and then there's a vast majority of the
policyholders whose only concern is the affordability
of their policies.  They have no interest in having
their premiums skyrocket so that a handful of people
can be paid more than their doctors are being paid.
How do you balance that?

That's what the settlement does.  It pays some
benefits to the past claimants and it corrects the --
eliminates the ambiguity going forward.  All the

1     settlements had it.  Two of them have already been

2     finally approved.  This one should be, too.

3          Past claimant relief, we talked about Robertson

4     didn't have any former policyholder benefit.  That's

5     that thousand dollar benefit.  Skelton had a similar

6     benefit.  The deceased policyholder benefit, this is

7     the only settlement that had that.  This is also the

8     only settlement that had the tripling of the lifetime

9     benefit.

10         This settlement has a premium rate freeze for a

11    year, which Ms. McCabe will talk about the value of

12    that.  The other two settlements had a loss ratio

13    provision, which is their way of limiting the premiums

14    going forward.  It was a tradeoff.  We chose the

15    premium rate freeze.  Class counsel agreed with that.

16    Overall, there is no question that this settlement is

17    infinitely better than most of those settlements which

18    have already been approved, and final judgment has been

19    entered in both of those cases.

20         THE COURT:  Under the Robertson and Skelton

21    cases, how long did the loss ratio provision affect

22    premiums in the future?

23         MR. LEVENTHAL:  I think they affect premiums

24    forever.  So they agreed to a loss ratio, and I believe

25    the loss ratio stays in place.  I'm not positive of

1    that.

2         The only other thing in our settlement I want

3    want to mention, obviously we have agreed, as the

4    settlement agreement makes clear, to pay the expenses

5    outside of the settlement without reducing any of the

6    benefits to the settlement class.  And so with that, I

7    think we can turn now to the actual factors for

8    approval.

9         And the first thing that I want to address is the

10   notice and the due process issues.  The form of the

11   notice was approved by the Court.  This is a copy of

12   the actual notices, of course, in the court record that

13   went out to all these policyholders.

14        This is a very comprehensive notice.  It is

15   drafted in the format advocated by the Federal Judicial

16   Center.  You'll see that the table of contents has sort

17   of a question and answer format so people can easily

18   find answers to questions.  It talks about what the

19   lawsuit is about in detail.  It explains how to exclude

20   yourself, how to object, what the consequences are.

21        It gives notice of the fairness hearing.  I don't

22   think there's any question that the Court did the right

23   thing when it approved the notice and ordered that it

24   be mailed out.

25        So the question is, you know, did we do what we

1    were supposed to do?  We retained Epiq Systems, Inc.,

2    as the settlement administrator.  Epiq Systems is one

3    of the leading class action settlement administrators

4    in the Country.  They mailed out the settlement notices

5    on May 14th.  They published the notice in USA Today on

6    May 26th and May 28th.  Twice.

7         They created a settlement web site, which is

8    www.supplementalinsurancesettlement.com, which was

9    listed in the publication notice and the written

10   notice.  On that web site, there are frequently asked

11   questions.  There are all the important dates.  You can

12   download a copy of the settlement agreement, other

13   documents.

14        And they also set up the toll free dial-in

15   number, which they fielded 18,490 telephone calls.

16   They had a voice-activated system, and they also had

17   live operator support.  So I don't think there's any

18   question in this case that we have a notice and a

19   notice plan that satisfied due process and the

20   requirements of Rule 23.

21        That brings us to the Ballard factors, and we

22   have addressed many of these in our brief.  And Mr.

23   Bohrer -- we've addressed all of them in our brief.

24   Mr. Bohrer has addressed some of them.  I am going to

25   touch on a couple of key points.

1    The first thing that the Court should realize is,

2    there are some significant legal standards that apply

3    to approval of settlements.  And the first, of course,

4    is that there is a very strong public policy and a

5    judicial policy favoring the settlement of class action

6    litigation.  And we've cited the cases on pages 35 and

7    36 of our brief.  By way of example, the District Court

8    in Minnesota, for example, in White v. National

9    Football League said, "The policy favoring the

10   voluntary resolution through settlement is particularly

11   strong in the class action context.  Settlement

12   minimizes the substantial burdens to the parties and

13   the scarce judicial resources that such litigation

14   entails."

15       You've got the Third Circuit that stated, "There

16   is an overriding public interest in settling class

17   action litigation, and it should therefore be

18   encouraged."  The 11th Circuit, "Public policy strongly

19   favors the pretrial settlement of class action

20   lawsuits."  The 6th Circuit, "There is an overriding

21   public interest in favor of settlement."  The 7th

22   Circuit, "Federal courts naturally favor the settlement

23   of class action litigation."  So you have an

24   overwhelming public policy in favor of settlement.

25       The second thing is, you also have a presumption

1  of fairness when you have a settlement that's been

2  negotiated at arm's length by experienced counsel.  And

3  the cases discussing that principle are on pages 36 and

4  38 of our brief.  Illustrating the point, there's a

5  case called Wal-Mart Stores v. Visa, a very large class

6  action litigation in the 2nd Circuit.  The Court said,

7  quote, "A presumption of fairness, adequacy, and

8  reasonableness may attach to a class settlement reached

9  at arm's length negotiations between experienced,

10  capable counsel after meaningful discovery."

11      And then the 3rd Circuit expressed it in a little

12  more detail and said, 'We have previously directed a

13  district court to apply an initial presumption of

14  fairness when reviewing a proposed settlement where the

15  settlement negotiations occurred at arm's length, there

16  was sufficient discovery, the proponents of the

17  settlement are experienced, and only a small fraction

18  of the class objected."  And every one of those factors

19  exist here.

20      I'm not going to belabor the arm's length

21  negotiations.  We've been over that.  Mr. Bohrer has

22  discussed the advanced nature of the Pipes case and the

23  discovery.  You can look at the docket of that case.

24  Judge Wright thought it was ripe for class

25  certification briefing.  Both -- you know, counsel on

1   both sides are obviously experienced.  And there has

2   been a very small fraction of the settlement class who

3   have objected.  Only nine or ten remaining objectors in

4   the case.

5        So to sum up, you have a strong public policy in

6   favor of the settlement, and you've got a presumption

7   of fairness.  So you move then to the Ballard factors.

8   They have been addressed in our brief.  A couple of key

9   points.

10       You know, the first Ballard factor talks about

11  sort of balancing the merits of these different cases

12  against the value of the settlement.  And Mr. Bohrer

13  touched on that.  But one point I want to make is that

14  when you're doing that analysis, you need to compare

15  apples to apples.  So if somebody comes in and says,

16  "You know, I think I've got a really strong case on the

17  merits in some other jurisdiction," that's not the

18  comparison.

19       This is a multi-state class action settlement.

20  So the issue on the merits is, what chance do you have

21  to win, succeed, take a certified class all the way

22  through trial somewhere else.  So it's not just the

23  merits of the individual claim.  It's the merits of

24  class certification.  Winning an individual case

25  somewhere because a court says actual charges is

1  ambiguous is not apples to apples.

2      What is the merits of class certification?  Can

3  you, you know, certify a class somewhere else?  Well,

4  the plaintiffs are 0 and 2 on certification.  Judge

5  Wright's decision, we've all heard about.  Last Friday,

6  the court up in Pennsylvania in the Smith case denied

7  class certification.  And that order is in the

8  supplemental appendix, I believe at Exhibit 27.

9  They're the end of that supplemental appendix.  You

10  will see the Smith order denying class certification

11  has been included.

12      And let's talk briefly about the merits of an

13  individual case on an individual basis.  We know that

14  we have now statutes in five different states that are

15  directly against the plaintiffs' position.  We also

16  know that in the state of Alabama, there is case law

17  against that position.  In fact, after the company

18  corrected these claims procedures -- or actually after

19  the company decided to make the change, it took a while

20  to actually implement it, the first case anywhere that

21  I know of on this issue was the Clayburk decision in

22  the state of Alabama, Federal Court, Middle District,

23  Clayburk v. Central United, which held that actual

24  charges was ambiguous.  Unambiguous, it meant the

25  amount that was actually paid because that's what the

1   loss was, and that could be the only reasonable

2   interpretation.

3        Now, since that time, there were then three other

4   district courts that decided the same way.  Then you

5   had the Ward case, which reversed one of those.  Then

6   you had a Guidry case in the 5th Circuit based on a

7   different type of policy.  And now you have a mixed bag

8   in the case law.

9        Just about two weeks ago, the 11th Circuit, in a

10  case called Philadelphia American Life v. Buckles,

11  decided that actual charges incurred was unambiguous

12  and could only mean the amount that was actually being

13  paid and accepted.  So now you have a split in the

14  circuits on that issue.  And the Philadelphia court

15  actually made reference to list prices as fictional or

16  fictitious amounts and said that were we to construe

17  actual charges incurred to mean -- they didn't use the

18  terminology "list prices," but anything other than the

19  actual amount that was being paid, that would lead to

20  an absurd result.

21       So the bottom line is, when you talk about the

22  merits, you've got statutes on one side.  You've got a

23  split between the case law.  And what is the case law

24  that the objectors keep saying is, you know, on their

25  side on the merits?  It's a bunch of cases that

```
 1  basically just decide actual charges as ambiguous.
 2  Some of those cases then say, "Okay.  Well, then it
 3  should be interpreted against the insurance company."
 4  Other cases say, "Okay.  Well, now because it's
 5  ambiguous, you have to go into this individual analysis
 6  of extrinsic evidence and what did the parties intend
 7  and sometimes what were the reasonable expectations."
 8        So it just evolves into, like, an individual
 9  trial.  But the point is, Ballard, you're supposed to
10  compare what are the chances of getting a class
11  certified and trying it, you know, to a successful
12  resolution against -- and on top of all that, the
13  expense of the litigation, how much time would it take,
14  what kind of judicial resources would be used up in the
15  process.  So -- and that also ties into the third
16  Ballard factor, which is the consideration of the
17  complexity, the length, and the expense of further
18  litigation.
19        What is the alternative to this settlement?  What
20  is that -- what is the result that the objectors or
21  proposed intervenors would have liked to have had
22  happen?  Well, they would have liked an alternative
23  chaos that would have been just unbelievable.  We're
24  going to have, what, litigation in -- throughout the
25  country, in state class actions.  We're going to have,
```

1    what, state class actions in all the different states,

2    even though class certification has now been denied in

3    two states?  We're going to have -- we're going to

4    relitigate the class certification issue with appeals

5    of certification.  In countless numbers of states,

6    we're going to fight over, you know, whether these

7    statutes are constitutional or not constitutional.  We

8    were going to have individual litigations about a term

9    that's supposed to be ambiguous.

10        It makes no sense at all.  It would be a massive

11   waste of judicial effort, which is why -- that's why

12   there's a public policy in favor of these kinds of

13   settlements, especially in class action litigation.

14   Because to continue them with protracted litigation,

15   especially when you have a multi-state scenario, is

16   just an enormous waste of party and judicial resources.

17        And the last fourth -- the fourth Ballard factor,

18   Mr. Bohrer has already touched on.  It sort of a no-

19   brainer here.  It's the amount of opposition.  The

20   amount of opposition is incredibly small.  You have 9

21   or 10 objectors out of 25,000 settlement class members.

22        I think it's instructive to look at Ballard

23   itself.  I mean, the Ballard case was a class of

24   18,500, and I believe there were 17 objectors in

25   Ballard.  Here, we have a class that's ten times the

 1   size as Ballard and is half the number of objectors.

 2   So the amount of objections, I think, is -- clearly

 3   weighs in favor of approval of the settlement.

 4   Obviously, we don't think there's any question that the

 5   settlement should be approved.

 6        Now, as for the substance of the objections,

 7   we'll respond to those after the objectors make their

 8   arguments.  I am going to turn this over to Ms. McCabe,

 9   who will take the Court through the various values of

10   the settlement.  Ms. McCabe.

11        MS. McCABE:  Good morning, Your Honor.

12        THE COURT:  Good morning.

13        MS. McCABE:  My purpose here is pretty limited.

14   The point I would like to make, Your Honor -- and most

15   of this information is already in the record -- is what

16   the cash value is of this settlement and what the long-

17   term value of the injunctive relief is to the class.

18        Let's talk about the monetary relief first.  And

19   as you know, Your Honor, this settlement involved claim

20   forms, which is fairly common in these types of

21   settlements.  And so there are -- there was a set

22   amount of money that the defendants set aside as

23   potential available to the class, and then the

24   settlement administrator collected claim forms from the

25   class.  And from that, we've gotten some preliminary

1   information to estimate how much of this value has

2   actually been claimed.

3       So for past claimants, we know that there were

4   over 1,900 claim forms filed, which is a very high take

5   rate for a settlement of this type.  Over 20 percent.

6   And although those claims have not been analyzed yet,

7   and they will be if this settlement is given -- is

8   finally approved, they will be analyzed and processed.

9   And they're going to have to be processed on a one-by-

10  one basis because these claims are fairly

11  individualized and the company only has limited

12  computerized data.  We can compare what the --

13      THE REPORTER:  Can you slow down, please?

14      MS. McCABE:  Sure.  The companies can compare

15  what the past claimants submitted as their physician

16  list prices.  Those list prices were entered into the

17  computer as the claims came in by claims examiners

18  manually.  And then we know what claims examiners paid

19  for each benefit as an actual charge benefit.

20      But what the system doesn't do is, it doesn't

21  apply annual maximums, which some of the policies have,

22  or lifetime maximums.  So those calculations are going

23  to have to be done on a one-by-one basis.  However, by

24  comparing those two numbers that we are able to get out

25  of the system, we do know that the estimated value

1  claimed by the past claimants is seven and a half

2  million dollars.  And this is actual money that is

3  going to be paid to the class, as Mr. Leventhal stated.

4  This is not a coupon.  This is not something that they

5  have to jump through hoops for.  This is not something

6  that I think was stated in one of the briefs that they

7  would have to go collect a lot of documents for.  All

8  they had to do was submit a form that stated their

9  name, address, and either a policy number, a date of

10  birth, or a social security number so the company could

11  identify them.

12      Now, the second group is former cancer

13  policyholders.  And these people no longer have a

14  policy, but were possibly affected in the past by rate

15  increases and perhaps dropped their policy.  So this

16  settlement permits them to register for a $1,000 --

17  future insurance, basically.  If they get cancer in the

18  next 10 years, even though they don't have a policy, if

19  they registered for this benefit, they can just send in

20  proof that they had been diagnosed and received

21  treatment and they can receive a $1,000 check.

22      Of these former cancer policyholders, we've

23  estimated that, discounted to present value and using

24  mortality and incidence rates to assume over the next

25  10 years how many of them would actually get cancer,