UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | | |
|---|---|---|
| Stephen K. Hege and Linda S. Hege, | ) | |
| | ) | C/A No.:  8:10-cv-01578-GRA |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | (Written Opinion) |
| | ) | |
| Aegon USA, LLC, f/k/a Aegon USA, | ) | |
| Inc., and Transamerica Life Insurance | ) | |
| Company, f/k/a Life Investors | ) | |
| Insurance Company of America, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter comes before the Court on Defendant Transamerica Life Insurance

Company's ("Transamerica") Motion for Summary Judgment.  Having considered the

parties' arguments, the exhibits in support of their respective positions, and the

applicable law, the Court denies Transamerica's motion.

## Background

Transamerica and its predecessor corporation, Life Investors Insurance

Company of America,[1] ("Life Investors") are the insurers on supplemental cancer

_____

[1]    According to Transamerica's Answer, effective October 2, 2008, Life
Investors Insurance Company of America merged into Transamerica.

insurance policies. These policies cover policyholders for the "actual charges" they incur for certain medical services. Historically, Transamerica had interpreted "actual charges" to mean the amount that the policyholder's healthcare provider initially billed to the policyholder, rather than the amount that the provider may have eventually accepted as payment in full.[2] Claims were therefore paid according to how much the provider billed the policyholder. However, in 2006, Transamerica revised its claims process so that it would pay only the amount that the provider accepted as payment in full. This often resulted in policyholders receiving substantially smaller payouts than they would have received under the pre-2006 practice.

In 1994, Plaintiffs purchased an "actual charge" supplemental cancer insurance policy (the "Policy") from Transamerica's predecessor and have since maintained that Policy. In 2003, Mr. Hege was diagnosed with cancer and began submitting claims under the Policy.

The Heges filed this action against Transamerica and its parent corporation Aegon USA Inc. on June 18, 2010, bringing claims for breach of contract, bad faith, fraud, and several types of declaratory relief. Plaintiffs assert that since April 1, 2006, Defendants have improperly interpreted "actual charges" to mean the

---

[2]     For example, the policyholder's primary health insurer may have an agreement with the provider that, in exchange for the business the insurer would bring the provider, the provider will accept a below-bill amount as final payment.

amounts accepted by providers as final payment for services rendered and have used that interpretation to underpay claims. Specifically, Plaintiffs allege the Policy mandates that Defendants pay the "actual charges" for covered treatments, services, and procedures for "Covered Persons," according to provider billings.

This suit is one of multiple actions filed against Defendants across the country regarding the interpretation of the term "actual charges" in their supplemental cancer insurance policies. The first action filed, *Gooch v. Life Investors Insurance Co. of America*, No.1:07-cv-00016 (M.D. Tenn. 2007) (*"Gooch"*), sought injunctive relief on behalf of a national class. Subsequently, numerous statewide class actions were brought against Defendants, including *Pipes v. Life Investors Insurance Co. of America*, No. 1:07-cv-00035 (E.d. Ark.) (*"Pipes"*). The plaintiffs' counsel in *Pipes*, Phillip Bohrer, Scott E. Brady, and Stan P. Baudin (collectively, "*Runyan* Class Counsel" or "Class Counsel"), filed a total of six of these "actual charges" actions against Defendants in various federal district courts; four were statewide class actions.[3] *See In re Aegon USA, Inc., Supplemental Cancer Ins. Litig.*, 571 F. Supp. 2d 1369, 1370 (J.P.M.L. 2008).

---

[3]     In addition to *Pipes*, those related actions are *Runyan v. Transamerica Life Ins. Co.*, No. 6:08-cv-06034 (W.D. Ark.) (not to be confused with the *Runyan* settlement action later filed in Arkansas state court); *Ross v. Life Investors Ins. Co. of America*, No. 4:08-cv-00064 (S.D. Miss.); *Weidman v. Life Investors Ins. Co. of America*, No. 2:08-cv-12870 (E.D. Mich.); *Harris v. Transamerica Life Ins. Co.*, No. 3:09-cv-00013 (M.D. La.); and *Nolan v. Life Investors Ins. Co. of America*, No. 3:08-cv-00339 (M.D. La.).

On November 21, 2008, Judge Susan Wright of the Eastern District of Arkansas denied class certification in *Pipes*. *See Pipes v. Life Investors. Ins. Co. of Am.*, 254 F.R.D. 544, 550 (E.D. Ark. 2008). Specifically, Judge Wright concluded that because the particular proposed class representatives' interests conflicted with those of policyholders, those proposed representatives could not adequately represent the class. *Id.*

*Runyan* Class Counsel and counsel for Defendants first discussed settlement in October 2008. After Judge Wright denied class certification and a November 2008 mediation failed, settlement discussions resumed. On March 3, 2009, *Runyan* Class Counsel, their clients, and Defendants agreed upon a national class action settlement. Among other things, the settlement provided that *Runyan* Class Counsel would receive $3,500,000 in attorneys' fees and that Defendants would not object when *Runyan* Class Counsel requested that amount at the settlement approval hearing.

On March 13, 2009, *Runyan* Class Counsel filed a new action in the Circuit Court of Pulaski County, Arkansas, to seek judicial approval of the settlement. *Co.*, No. CV-09-2066-3 (Ark. Cir. Ct.) (*"Runyan"*). The named *Runyan* plaintiffs consisted of the same named plaintiffs from *Pipes* and the other five prior actions. After commencing the *Runyan* action, Class Counsel and Defendants jointly moved

to stay all six federal actions pending the *Runyan* court's final approval of the settlement.

Defendants filed their answers in *Runyan* on April 3, 2009. Two weeks later, the parties memorialized their earlier agreement on all the settlement's terms in a written class action Settlement Agreement, which they filed on April 20, 2009. Three days later, the *Runyan* court granted preliminary approval to the settlement, defining the settlement class as follows:

> All persons in the United States: (I) who were an insured, covered person, or beneficiary under a Cancer Policy in force at any time from January 1, 2004 through the date of this Order; or (ii) who were an insured, covered person, or beneficiary under a Non-Cancer Actual Charges Policy which is in force at the time of this Order, or who submitted a claim for Actual Charges Benefits under a Non-Cancer Actual Charges Policy after the effective date of the 2006 Updated Claims Procedures; or (iii) the surviving spouse or legal representative of such persons defined in (I) or (ii).

The *Runyan* court approved all named plaintiffs as representatives for the settlement class. It also approved the parties' proposed written notice, publication notice, and claim forms, as well as their proposed time lines for the mail notice, publication notice in *USA Today*, and the publication of a settlement Web site. The court noted that any class members who did not timely opt out could object to the proposed settlement in writing and at a fairness hearing to be conducted later that year.

On May 14, 2009, the Notice of Proposed Class Action Settlement (the "Notice") was mailed to over 250,000 class members, including the Heges. The

Notice indicated that policyholders who, like the Heges, had previously submitted claims, could receive a monetary benefit of 40% of the difference between the amount billed and the amount finally accepted, capped at a maximum of $15,000. Additionally, the Notice included a description of "non-monetary benefits" that policyholders would receive if they did not opt out.  Among these benefits was a provision that in the future, "actual charges" would be construed as "the amount legally owed to the provider."  This would be a benefit, the Notice stated, because the parties "expect[ed]" it would likely lessen "the amount and frequency of future premium increases."  In the same paragraph, the Notice stated that such a construction was consistent with South Carolina law.  Another non-monetary benefit was that Transamerica would waive any "claims or counterclaims for overpayment of benefits that [it] might otherwise have" against policyholders.

The Heges did not opt out of the settlement.  Instead, Mr. Hege submitted a written objection to the settlement's terms.  Specifically, Mr. Hege stated that he thought the $15,000 payment cap was unfair, but he was staying in the settlement class because he feared that Transamerica would sue him if he opted out.

In October 2009, Mr. Hege and other objecting class members from South Carolina (collectively, the "South Carolina Objectors") moved the *Runyan* court to carve out a subclass for South Carolina class members.  Alternatively, the South Carolina Objectors requested that the *Runyan* court provide South Carolina class

members additional time to opt out of the settlement.  The South Carolina Objectors argued that only after the time to opt out had expired did they learn that South Carolina law actually provided relief far exceeding what class members would receive by settling, making the settlement unfair to South Carolina class members.

After hearing a number of objections and motions to intervene, the *Runyan* court rejected all objections and denied all motions to intervene.  Thereafter, on December 21, 2009, the *Runyan* court entered a Final Order and Judgment (the "*Runyan* Order" or the "Order") that gave final approval to the settlement and dismissed all class members' claims with prejudice.  The Order contained a release wherein class members waived any claims they could assert against Transamerica regarding "actual charges" policies and payments made under those policies.  The *Runyan* court also awarded Class Counsel the agreed-upon $3,500,000 in attorneys' fees.

Also on December 21, 2009, the district court in *Gooch* entered an order certifying a national class and entering partial summary judgment in favor of the plaintiffs.  *See Gooch v. Life Investors Ins. Co. of Am.*, 264 F.R.D. 340 (M.D. Tenn. 2009).  Significantly, the *Gooch* court granted summary judgment to the plaintiffs on their claims for breach of contract claim and declaratory/injunctive relief, both of which centered on the meaning of "actual charges."

## Procedural History

On October 4, 2010, Transamerica filed the instant Motion for Summary Judgment, claiming that under the Full Faith and Credit Act, 28 U.S.C. § 1738, Plaintiffs' claims were barred by claim preclusion, issue preclusion, and release.  On October 21, 2010, Plaintiffs filed a Response in Opposition, arguing that the *Runyan* Order is unenforceable under Arkansas state law and federal law.  Transamerica replied on October 25, 2010, asserting, as an additional defense, that this Court lacks jurisdiction over Plaintiffs' claims under the *Rooker–Feldman* doctrine.  The Court heard oral arguments on the pending issues on October 26, 2010.

### Standard of Review

Summary judgment is appropriate where the admissible evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56©.[4]  The court must view the facts in the light most favorable to the party opposing summary judgment, and it may not make credibility determinations or weigh the evidence.  *Thompson v. Aluminum Co. of Am.*, 276 F.3d 651, 656 (4th Cir. 2002).  To withstand a properly supported motion for summary judgment, the non-moving party must produce competent evidence sufficient to reveal the existence of a genuine issue of material fact for

---

[4]    Recent amendments to Rule 56 became effective on December 1, 2010.  However, the Court applies the version of Rule 56 in effect when Transamerica filed its motion for summary judgment.  *See Galustian v. Peter*, 591 F.3d 724, 730 n.4 (4th Cir. 2010.).

*A.R.A.*

trial.  Fed. R. Civ. P. 56 (e)(2); *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

Release and *res judicata* are affirmative defenses.  Fed. R. Civ. P. 8(c)(1); *see also Taylor v. Sturgell*, 553 U.S. 880, 907 (2008).  Accordingly, it is incumbent upon Transamerica to prove them.  *See Taylor*, 553 U.S. at 907.

<u>Discussion</u>

For the reasons set forth below, this Court concludes (1) that it possesses jurisdiction over the Heges' claims and that the *Rooker–Feldman* doctrine does not bar them; (2) that the *Runyan* Order is not entitled to full faith and credit because of substantial constitutional deficiencies in the *Runyan* action; and (3) that even if there were no such deficiencies in the *Runyan* action, the *Runyan* order is not entitled to preclusive effect under Arkansas law.

**I.    Subject Matter Jurisdiction and the *Rooker–Feldman* Doctrine**

Transamerica does not challenge the statutory basis for the Court's subject matter jurisdiction.  *See* U.S.C. § 1332(a).[5]    Instead, it argues that the *Rooker–Feldman* doctrine deprives this Court of jurisdiction over the Heges' claims because they were already litigated in *Runyan*.  The Court shall consider this argument first because of the Court's obligation to satisfy itself of its jurisdiction before proceeding further.  *See Davis v. Pak*, 856 F.2d 648, 650 (4th Cir. 1988).

---

[5]    Plaintiffs are citizens of South Carolina, Defendants are citizens of Iowa, and the amount in controversy exceeds $75,000.

*G.R.A.*

The *Rooker–Feldman* doctrine prevents "a party losing in state court . . . from seeking what in substance would be appellate review of the state judgment in a United States district court." *Johnson v. De Grand*y, 512 U.S. 997, 1005–06, (1994). *Rooker–Feldman* applies where "the losing party in state court filed suit in federal court after the state proceedings ended, complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292 (2005). However, the doctrine is to be construed narrowly and applied only in limited circumstances. *Lance v. Dennis*, 546 U.S. 459, 466 (2006) (per curiam).

While *Rooker–Feldman* is a viable doctrine, this Court concludes that the doctrine does not apply to Plaintiffs because they were not true parties to the *Runyan* Order. As the Supreme Court has explained, the *Rooker–Feldman* doctrine generally "does not bar actions by nonparties to the earlier state-court judgment." *Lance*, 546 U.S. at 466 (footnote omitted). For example, in *Lance*, the plaintiffs to the collateral action were not named parties in the original case, but they were in privity with the named plaintiff from the original case. Nonetheless, the Supreme Court found *Rooker–Feldman* inapplicable because, despite privity, the collateral action plaintiffs lacked the legal ability to challenge the decision in question on direct appeal. *See id.* at 466.

Arkansas law places the Heges in a similar position as the collateral action plaintiffs in *Lance*. "It is well settled in Arkansas that an unnamed class member who failed to intervene at the trial court level cannot appeal a settlement entered into by the named class members, even if the unnamed class member submitted objections to the fairness of the settlement." *DeJulius v. Sumner*, 282 S.W.3d 753, 756 (Ark. 2008) (internal citation omitted). Rather, an unnamed, objecting class member who does not intervene or opt out has one remedy: "collaterally attack the settlement approval by filing a separate suit . . . ." *Haberman v. Lisle*, 884 S.W.2d 262, 263 (Ark. 1994). In *Ballard v. Advance America*, 79 S.W.3d 835 (Ark. 2002), the Supreme Court of Arkansas extended *Haberman* to challenges of class action settlement approvals and held that a non-intervening, unnamed class member lacks standing to directly appeal the approval of the settlement. 79 S.W.3d at 837.

Here, Mr. Hege objected to the *Runyan* settlement's terms, but neither he nor Mrs. Hege intervened in the litigation.[6] Thus, Arkansas law bars Plaintiffs from challenging the Order on direct appeal. This bar places Plaintiffs in materially the same posture as the *Lance* plaintiffs.

Although the *Lance* Court did not entirely foreclose the possibility that a non-party could *ever* be barred by *Rooker–Feldman* from mounting a collateral attack,

---

[6]     Even if either Mr. or Mrs. Hege had moved to intervene, it is uncertain whether such a motion would have been successful. Three other objectors moved to intervene, but the *Runyan* court denied their motions. (*See* Order, Dec. 8, 2009, at 13–22, ECF No. 28-32.)

*A.R.A.*

*see Lance*, 546 U.S. at 466 n.2, in light of Plaintiffs' limited options under Arkansas law and the U.S. Supreme Court's clear command to construe *Rooker–Feldman* narrowly, *Rooker–Feldman* cannot reasonably be construed to bar Plaintiffs' claims. The purpose of the doctrine is to encourage dissatisfied parties to first seek relief through direct appellate review; however, where, as here, the losing party cannot directly appeal a decision, the rationale underlying this rule is inapposite, and applying the rule would not further its purpose.

Based on the foregoing, this Court concludes that the *Rooker–Feldman* doctrine does not apply to the instant case. However, with due regard for concerns of comity and federalism, this Court shall consider Transamerica's argument in greater detail.

The Fourth Circuit Court of Appeals has interpreted *Exxon* to hold that the proper inquiry for application of *Rooker–Feldman* examines the source of the plaintiff's injury: if the state court judgment caused the plaintiff's injury, the claim is barred, but a claim alleging another source of injury is an independent claim and is not barred. *Davani v. Va. Dept. of Transp.*, 434 F.3d 712, 718–19 (4th Cir. 2006). A district court does not lose subject-matter jurisdiction

> simply because a party attempts to litigate in federal court a matter previously litigated in state court. If a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.

*A.R.A.*

*Exxon Mobil Corp.*, 544 U.S. at 293 (internal citations and quotations marks omitted).  In other words, the test is not whether the relief sought in the federal suit would upset the enforcement of a state court decree, but rather whether the relief would reverse or modify the state court decree.  *Adkins v. Rumsfeld*, 464 F.3d 456, 464 (4th Cir. 2006).  Thus, a federal court should not confuse *Rooker–Feldman*, which is a jurisdictional doctrine, with the concept of claim preclusion, which is an affirmative defense that has no bearing on its jurisdiction.  *See Davani*, 434 F.3d at 717–18 (observing that the Fourth Circuit's pre-*Exxon* interpretation of *Rooker–Feldman* essentially and improperly was a jurisdictional doctrine of *res judicata*); *see also Lance*, 546 U.S. at 466 (holding that the district court in that case "erroneously conflated preclusion law with *Rooker–Feldman* . . . . *Rooker–Feldman* is not simply preclusion by another name.").

Here, Transamerica argues that Plaintiffs are asking this Court to "review and reverse" the *Runyan* Order.  (Reply Mem. 4, ECF No. 29.)  However, Plaintiffs' Complaint contains no such request.  The Heges primarily seek damages under three South Carolina law causes of action:  breach of contract, fraud, and bad faith.  While the *Runyan* complaint contained similar, Arkansas law claims, that similarity is relevant for preclusion purposes, not for determining jurisdiction.  Moreover, these claims are not for an injury caused by the *Runyan* court itself, but for an injury allegedly caused by Defendants.  *See Davani*, 434 F.3d at 717–18 (noting that after *Exxon, Rooker–Feldman* does not apply in such cases).  Under *Exxon* and *Davani*,

Plaintiffs' claims are independent; therefore, *Rooker–Feldman* does not bar these claims, even if the eventual result upsets the enforcement of the *Runyan* Order. *See Adkins*, 464 F.3d at 464.

In their fourth cause of action,[7] the Heges seek declarations that (1) the term "actual charges" is to be construed in their favor, (2) S.C. Code Ann. § 38-71-242 either does not apply to their Policy or is unconstitutional, and (3) the *Runyan* Order does not preclude their damages claims.  As for the first two declarations sought, their subject matter does not involve an injury caused by the *Runyan* court. Plaintiffs seek construction of their insurance policy and an interpretation of a South Carolina statute.

As for the third declaration, Plaintiffs arguably invite this Court to consider questions that the *Runyan* court itself addressed, such as compliance with due process requirements.  While these questions may be of a type that an appellate court would consider on direct appeal, it does not necessarily follow that Plaintiffs are seeking the sort of appellate relief that *Rooker–Feldman* prohibits federal district courts from granting.  In essence, what Plaintiffs seek is a determination that they are not barred from asserting their South Carolina law claims and recovering damages in the instant action.

---

[7]    Plaintiffs assert four causes of action, but the Complaint identifies the third and fourth causes as "Count IV" and "Count V," respectively.

Furthermore, this Court finds instructive the long-standing availability of collateral challenges to a prior judgment on due process grounds. *See, e.g.*, *Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367 (1996) (state-court class action settlement order); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) (state-court class action judgment); *Hansberry v. Lee*, 311 U.S. 32 (1940) (same). If *Rooker–Feldman* indeed barred such collateral review, the above three opinions would be the result of the Supreme Court's gross oversight or disregard of its own jurisprudence. Such a possibility is unlikely, particularly given the *Hansberry* court's command that courts hearing due process collateral challenges have a duty to inquire into due process compliance underlying the prior judgment. *See Hansberry*, 311 U.S. at 40 (citing *W. Life Indem. Co. v. Rupp*, 235 U.S. 261, 273, (1914)). Accordingly, *Rooker–Feldman* does not bar this claim.

Based on the foregoing, this Court holds that *Rooker–Feldman* does not deprive it of subject matter jurisdiction over any of Plaintiffs' claims. To hold otherwise would erroneously conflate *res judicata* with jurisdiction, thereby "superseding the ordinary application of preclusion law pursuant to 28 U.S.C. § 1738." *Exxon Mobil Corp.*, 544 U.S. at 283.

With subject matter jurisdiction thus established, the Court proceeds to Transamerica's affirmative defenses.

**II.    Full Faith and Credit**

*A.R.A.*

As the parties recognize, the applicability of Transamerica's affirmative defenses turns, in part, on the threshold issue of whether this Court is obligated to afford the *Runyan* Order full faith and credit.  The Full Faith and Credit Act provides that all properly authenticated state court judicial proceedings "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken."  28 U.S.C. § 1738; *accord Migra v. Warren City Sch. Dist. Bd. Of Educ.*, 465 U.S. 75, 81 (1984) ("a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.")   A judgment entered in a state-court class action, "like any other judgment entered in a state judicial proceedings, is presumptively entitled to full faith and credit under the express terms of [§ 1738]."  *Matsushita Elec. Indus. Co.*, 516 U.S. at 374.

An important predicate to this rule is that, in order for the judgment to acquire the presumption of full faith and credit, the court entering the judgment must have complied with the Due Process Clause.  As the Eleventh Circuit has stated,

> class actions, as other cases, are subject to the requirements of due process . . . .  Before the bar of claim preclusion may be applied to the claim of an absent class member, it must be demonstrated that invocation of the bar is consistent with due process, and an absent class member may collaterally attack the prior judgment on the ground that to apply claim preclusion would deny him due process.

*Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1226 (11th Cir. 1998) (internal citations omitted). This is because "[a] State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state and federal courts are not required to afford full faith and credit to such a judgment." *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 482 (1982) (footnote omitted); *see also Shutts*, 472 U.S. at 805 (a judgment rendered without affording an absent party due process is rendered without personal jurisdiction and therefore has no *res judicata* effect on that party). Accordingly, before proceeding further, this Court shall first consider whether the *Runyan* court's exercise of personal jurisdiction afforded Plaintiffs due process. *See Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1285 (11th Cir. 2007); *see also* William B. Rubenstein, *et al.,* 5 *Newberg on Class Actions* § 16:25 (4th ed. 2009) (once the collateral court determines that the parties in question were members of the class in the previous action, "the next consideration is whether the initial proceeding complied with due process.").

The Supreme Court has ruled that a state court may, consistent with due process requirements, exercise personal jurisdiction over "an absent [national] class-action plaintiff, even though the plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant." *Shutts*, 472 U.S. at 811. However, in a class action wholly or predominately seeking money judgments, an absent class plaintiff must receive "notice plus an opportunity to be heard and participate in the litigation, whether in person or through

counsel." *Id*. at 812, 812 n.3. Additionally, he must be provided an opportunity to opt out of the class proceedings by executing and returning an opt-out form to the forum court. *Id.* Finally, the named plaintiffs must "at all times adequately represent the interests" of the absent class plaintiff. *Id.* (citing *Hansberry*, 311 U.S. at 42–43).

The Supreme Court has left unresolved the proper scope of a federal court's collateral review of a state court's class action judgment for satisfaction of these due process requirements. In *Matsushita*, the Supreme Court avoided setting forth the scope of collateral review for *Shutts* compliance. In *Matsushita*, a Delaware state court certified a settlement class and then approved a global class action settlement of all claims relating to Matsushita's acquisition of MCA, Inc. 516 U.S. at 370–71. The settlement included a release of all claims relating to the acquisition, including claims over which federal courts had exclusive jurisdiction. *Id*. at 371 (internal citation omitted). Subsequently, in federal court, Matsushita asserted that the Delaware judgment precluded further litigation over still-pending exclusively federal claims. *Id.* at 372. The question before the Supreme Court thus was whether the Full Faith and Credit Act applied to state-court settlement judgments releasing claims that, because of their exclusively federal jurisdictional nature, could not have been heard in the state court. *See id*. at 372–73.

In the course of resolving that question in the affirmative, the Supreme Court mentioned that the Delaware trial court explicitly found, and the Delaware Supreme

Court affirmed on direct appeal, that the class notices sent out fully complied with due process and that the representative plaintiffs fairly and adequately protected the interests of the settlement class. *Id.* at 378–79 (internal citations omitted). The Supreme Court concluded that under Delaware law, the judgment would have preclusive effect, and therefore, under § 1738, the class members were bound by the Delaware judgment. *See id.* at 379. However, the Supreme Court explicitly noted that its analysis did not entail a consideration of *Shutts* due process compliance. *See id.* at 378 n.5.

*Matsushita* has since become part of an "open, and hotly litigated question" among courts and scholars regarding the scope of collateral due process review. *See Hospitality Mgmt. Assocs., Inc. v. Shell Oil Co.*, 591 S.E.2d 611, 618–19 nn.11–12 (S.C. 2004) (comparing court cases and law review articles); *State v. Homeside Lending, Inc.*, 826 A.2d 997, 1016–17 (Vt. 2003) (same). The question is whether the collateral court is constrained to a limited review, considering only whether the class action settlement court utilized adequate procedures to assure itself that the *Shutts* due process requirements were met, or, instead, may engage in a broader, merits-based due process review. *Hospitality Mgmt.*, 591 S.E.2d at 618. To date, the Fourth Circuit has not weighed in on this question. *See* Note, Dow Chemical Co. v. Stephenson: *A Class Action Catch 22*, 55 S.C.L. Rev. 467, 469 (2004). Accordingly, the question of which standard to apply appears to be an open one in this Circuit.

Respectively, the leading opinions for each position are *Epstein v. MCA, Inc.*, 179 F.3d 641 (9th Cir. 1999), and *Stephenson v. Dow Chemical Co.*, 273 F.3d 249 (2d Cir. 2001).   In *Epstein*, the Ninth Circuit held that collateral review of compliance with *Shutts* for absent class members is limited to a consideration of "whether the procedures in the prior litigation afforded the party against whom the earlier judgment is asserted a 'full and fair opportunity' to litigate the claim or issue." *Epstein*, 179 F.3d at 648–49.  Despite the *Matsushita* Court's statement that it had avoided considering any issues of due process compliance, the *Epstein* court believed that the Supreme Court's decision that the *Matsushita* plaintiffs were bound by the Delaware settlement necessarily implied a determination by the Supreme Court that due process had been satisfied.  *Id*. at 645.  Had due process not been satisfied, the *Epstein* court reasoned, the Supreme Court would have violated its rule from *Kremer* by extending full faith and credit to a constitutionally infirm judgment. *Id.*  The *Epstein* court then concluded that because the *Matsushita* Court went no further than to mention that the Delaware state court made findings on the *Shutts* requirements, *Matsushita* implicitly prescribes limited, procedure-only review.  *See Id*. at 649.

The *Epstein* court also hinged its decision on the availability of direct appellate review for absent class members.[8]  The *Epstein* court reasoned as follows:

---

[8]       This availability of a right of direct appeal implicates the existence of procedural due process—a right which, as discussed earlier, does not exist for the Heges under Arkansas law.   The Supreme Court has made it

> Simply put, the absent class members' due process right to adequate representation is protected not by collateral review, but by the certifying court initially, and thereafter by appeal within the state system and by direct review in the United States Supreme Court . . . .
>
> Due process requires that an absent class member's right to adequate representation be protected by the adoption of the appropriate procedures by the certifying court and by the courts that review its determinations; due process does not require collateral second-guessing of those determinations and that review.

*Id*. at 648 (citations omitted).

Several years later, the Second Circuit rejected the *Epstein* view in *Stephenson*. In *Stephenson*, two Vietnam War veterans sued in 1998 and 1999 for injuries based on their wartime exposure to Agent Orange. *Stephenson*, 273 F.3d at 255. However, in 1984, a court had approved a global class settlement for such claims. The settlement provided that no payments would be made after 1994; however, the *Stephenson* plaintiffs' conditions were not diagnosed until 1996 and 1998. *Id*. at 252–53. The district court found their claims to be impermissible collateral attacks on the 1984 settlement and dismissed the case. *Id*. at 256.

The Second Circuit reversed, concluding that where a party seeks to prevent a prior settlement from having *res judicata* effect, a collateral attack on due process grounds is permissible. *Id*. at 257. The *Stephenson* court found that the propriety of such collateral attacks "is amply supported by precedent":

---

abundantly clear that a meaningful right to lodge an objection to a class action settlement necessarily involves the right of a direct appeal. *Devlin v. Scardelleti*, 536 U.S. 1, 10–11 (2002).

*A.R.A.*

> In *Hansberry v. Lee*, 311 U.S. 32, 61 S. Ct. 115, 85 L. Ed. 22 (1940), the Supreme Court entertained a collateral attack on an Illinois state court class action judgment that purported to bind the plaintiffs. The Court held that class action judgments can only bind absent class members where "the interests of those not joined are of the same class as the interests of those who are, and where it is considered that the latter fairly represent the former in the prosecution of the litigation." *Id*. at 41, 61 S. Ct. 115; *cf. Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 805, 105 S. Ct. 2965, 86 L. Ed.2d 628 (1985) ("[I]t is true that a court adjudicating a dispute may not be able to predetermine the *res judicata* effect of its own judgment."). Additionally, we have previously stated that a "[j]udgment in a class action is not secure from collateral attack unless the absentees were adequately and vigorously represented." *Van Gemert v. Boing Co.*, 590 F.2d 433, 440 n.15 (2d Cir. 1978), *aff'd* 444 U.S. 472, 100 S. Ct. 745, 62 L. Ed. 2d 676 (1980).

*Id.* at 258. The *Stephenson* court then inquired whether the settlement class representatives and their counsel had adequately represented the plaintiffs. Finding the representation lacking, and further noting that, as an alternative ground, notice was also likely inadequate, the *Stephenson* court concluded that applying *res judicata* to the plaintiffs' claims would violate their due process rights. *Id*. at 260–61. On appeal to the Supreme Court, an equally divided court affirmed in pertinent part. *Dow Chem Co. v. Stephenson*, 539 U.S. 111, 112 (2003) (per curiam).

After carefully reviewing *Epstein, Stephenson,* and other authorities bearing upon the scope of collateral *Shutts* review, this Court believes that, at least under the circumstances presented in this case, the *Stephenson* view presents the appropriate scope of analysis.

*A.A.A.*

First, this Court agrees with the Second Circuit that the right of collateral attack has been long recognized by precedent.  *See, e.g.*, *Hansberry*, 311 U.S. at 41; *Matsushita Elec. Indus. Co.*, 516 U.S. at 396 ("Final judgments . . . remain vulnerable to collateral attack for failure to satisfy the adequate representation requirement."  (Ginsburg, J., concurring in part and dissenting in part)); *In re Agent Orange Prod. Liab. Litig.*, 996 F.2d 1425, 1435 (2d Cir. 1993); *In re Real Estate Title & Settlement Servs. Antitrust Litig.*, 869 F.2d 760 (3d Cir. 1989); *Gonzales v. Cassidy*, 474 F.2d 67, 72 (5th Cir. 1973); *see generally* Patrick Woolley, *The Availability of Collateral Attack for Inadequate Representation in Class Suits*, 79 Tex. L. Rev. 383, 384–86 (2000).

Second, the factual circumstances underlying the *Epstein* position are not present in this case; thus, even if this Court were to apply the *Epstein* position, this Court's conclusion would not change.  *Epstein* and many cases in accord base their narrow scope of inquiry, at least in part, on an absent class member's ability to mount substantive challenge to the settlement court's due process compliance on direct appellate review.  *See, e.g.*, *Epstein*, 179 F.3d at 648; *Hospitality Mgmt.*, 591 S.E.2d at 619; *Fine v. Am. Online, Inc.*, 743 N.E.2d 416, 420 (Ohio Ct. App. 2000).  These opinions do not outright deny an absent class member's right to *any* collateral review; rather, they "envision[] that direct appellate review of a class action is the appropriate vehicle to correct whatever errors may have been made at the trial court level."  *Hospitality Mgmt.*, 591 S.E.2d at 619 (footnote omitted).

However, as discussed above, Arkansas law denies Plaintiffs a right to appeal the *Runyan* Order. As such, *Epstein* and its disciples' reasoning is the proverbial square peg to the round hole of this case. Indeed, the sole mechanism for correction that Arkansas law provides Plaintiffs is collateral review. Reaching the result urged by Defendants, then, would deny Plaintiffs of *any* opportunity for meaningful due process review—something which even *Epstein* does not do. Because of the state of Plaintiffs' rights under Arkansas law, *Epstein* and its progeny are unpersuasive and in any event do not support Defendants' position under the circumstances present in this case.

Third, in deducing that *Matsushita* necessarily turned on a due process determination, the *Epstein* court failed to consider that the *Shutts* due process requirements go to personal jurisdiction—something that, unlike subject matter jurisdiction, is not normally to be considered by an appellate court unless properly preserved and presented for appellate review. Indeed, the *Matsushita* Court refused to take up due process because that specific question was not presented to the Court. 516 U.S. at 39 n.5. Rather, the only issue presented in *Matsushita* was "whether a federal court can withhold full faith and credit from a state court final judgment approving a class action settlement *simply* because the settlement included a release of exclusively federal claims." Brief for Petitioners at I, *Matsushita Elec. Indus. Co, Ltd. v. Epstein*, 516 U.S. 367 (1996), (No. 94-1809) (1995 WL 466391) (emphasis added) (referred to in *Matsushita Elec. Indus. Co.,*

*Ltd. v. Epstein*, 515 U.S. 1141 (1995) (granting certiorari)). Accordingly, a due process decision would have been advisory in nature. Just as the *Epstein* court would not presume that the *Matsushita* Court ran afoul of the *Kremer* rule, *Epstein*, 179 F.3d at 645, this Court likewise will not presume that the *Matsushita* Court fashioned a test for collateral review, decided whether due process was satisfied under that test, and then hid its test and decision between the lines of its opinion for lower courts to divine. Instead, this Court reads *Matsushita* to rule on the precise issues presented to it.

Finally, apart from the persuasiveness of *Epstein* or *Stephenson* themselves, policy considerations favor a more searching inquiry in this case. For the Supreme Court of South Carolina, the question of which standard to apply came down to a choice between important policies. *See Hospitality Mgmt.*, 591 S.E.2d at 619. On the one hand, judicial efficiency and finality of judgments favor limited review. *Id*. "On the other hand, there is the fundamental interest in not allowing constitutionally infirm judgments to be enforced." *Id*. In choosing the limited scope, the *Hospitality Management* court based its decision on *Epstein*'s assumption that "direct appellate review of a class action is the appropriate vehicle" for correcting due process-based errors. *Id*. As discussed above, Plaintiffs are locked out of that vehicle. As such, the competing—and, in any event, more fundamental—policy of enforcing the Constitution outweighs efficiency and finality concerns.

*A.R.A.*

Page 25 of 47

This Court is not unmindful of the arguments supporting the *Epstein* position. However, particularly when a party has no other post-judgment remedy, the tradition of allowing collateral attacks on due process grounds "should not be allowed to pass easily into the discarded heap of nice-but-antique procedures that are too wearisome to be endured in the press of modern needs."   18A Charles Alan Wright *et al.,* *Federal Practice and Procedure* § 4455 (3d ed. 2005) ("*Federal Practice and Procedure*").

Having thus established that it is proper for this Court to inquire whether Plaintiffs were afforded due process in *Runyan*, this Court next considers whether the notice and representation Plaintiffs received in *Runyan* were constitutionally sufficient.

## A. Adequacy of Notice

The notice provided to class members "must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  *Shutts*, 472 U.S. at 812 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314–15 (1950)).  A "fully descriptive notice" that describes the action and the plaintiffs' rights satisfies the notice prong of due process.  *Id*. On the other hand, if the class members are not provided with enough information to make an informed choice, the notice is constitutionally deficient.  *See In re Fed. Skywalk Cases*, 97 F.R.D. 365 (D. Mo. 1982); 7B *Federal Practice and Procedure*

§ 1796.6 ("A proposed notice that is incomplete or erroneous or that fails to apprise the absent class members of their rights will be rejected as it would be ineffective to ensure due process. . . .  Only if sufficient information is provided will the recipient be able to determine whether to object to the proposal or, if permitted, to opt out of the compromise.").

Normally, due process does not necessarily require a global class action settlement notice to contain detailed, comprehensive information about the law of class members' states. *See* 7B *Federal Practice and Procedure* § 1796.6.  However, due process does require that the notice not be materially misleading.  *See, e.g.*, *Homeside Lending, Inc.*, 826 A.2d at 1010–11 ("If we are to hold that the notice was sufficient to confer jurisdiction by consent, class members had to be able to evaluate what they were consenting to."); *Gerenson v. Pa. Life & Health Ins. Guar. Ass'n*, 729 A.2d 1191, 1197 (Pa. Super. Ct. 1999) (holding that class notice that contained material inaccuracies regarding benefits of remaining in class and legal rights of members who opt out was insufficient to bind plaintiffs to judgment).

The Notice provided to Plaintiffs included a description of "non-monetary benefits" that policyholders would receive if they did not opt out. (*See* Notice 7–8, ECF No. 28-7.)  According to the description, one benefit would be that, in the future, "actual charges" would be construed as "the amount legally owed to the provider." (*Id*. at 7.) This would be a benefit, the Notice stated, because the parties "expect[ed]" it would lessen "the amount and frequency of future premium

*A.A.A.*

Page 27 of  47

increases." (*Id*.)   In the same paragraph, the Notice indicated that such a construction was consistent with "current" South Carolina law, explicitly citing Section 38-71-242(A) of the South Carolina Code.  (*Id*.)  Another non-monetary benefit was that Transamerica would waive any "claims or counterclaims for overpayment of benefits that [it] might otherwise have" against policyholders.  (*Id*. at 8.)

This Court finds that the description of "benefits" provided to Plaintiffs was materially misleading.  The Notice was technically correct, in that when the Notice was mailed, South Carolina's statutory definition of "actual charges" was in effect.[9] However, conspicuously absent was any indication that this definition did not apply to policies issued before June 4, 2008, or that at least one court in South Carolina had awarded plaintiffs damages in a similar "actual charges" lawsuit.  In *Ward v. Dixie National Life Insurance Co.*, the plaintiffs, who were South Carolina residents, were the insureds on supplemental cancer insurance policies containing "actual charges" provisions.  Like Transamerica, the defendant-insurer had previously paid benefits according to the amounts policyholders were billed but then began paying claims based on the much smaller amounts that providers eventually accepted as payment in full.  The Fourth Circuit held that "actual charges" was patently ambiguous and therefore, under South Carolina law, would be construed in favor of

---

[9]     Section 38-71-242, which defines "actual charges" as the final amount the provider accepts as payment in full, took effect June 4, 2008.  *See* 2008 S.C. Acts 2242.

the insured.  *Ward v. Dixie Nat'l Life Ins. Co.*, 257 F. App'x 620, 627 (4th Cir. 2007) (en banc) (per curiam).   On remand, District Judge Joseph F. Anderson expressly rejected the insurer's contention that Section 38-71-242, which had been passed after the Fourth Circuit's decision, applied retroactively to the plaintiffs' policies. *Ward v. Dixie Nat'l Life Ins. Co.*, No. 3:03-3239-JFA, slip. op. at 7 (D.S.C. Aug. 12, 2008).   Later that year, in accordance with the Fourth Circuit's opinion, Judge Anderson entered summary judgment in favor of the plaintiffs and awarded them $ 7.8 Million in damages.  *Ward v. Dixie Nat'l Life Ins. Co.*, No. 3:03-3239-JFA (D.S.C. Nov. 12, 2008 & Dec. 15, 2008).   Each of these decisions predated the *Runyan* litigation and the Notice by at least three months.   Thus, when the parties drafted and mailed the Notice, there was ample evidence that most South Carolina class members in *Runyan* would not be liable to Defendants for overpayment and instead were legally entitled to 100% of the disputed benefits, rather than a percentage or capped amount.

Contrary to that evidence, the Notice's language created an impression that a South Carolinian who had purchased a policy prior to June 4, 2008, was not entitled to *any* relief and, therefore, could not possibly receive any greater benefit from litigation than the "benefits" of the settlement, which included a non-committal prediction of low, infrequent increases in premiums; conversely, a South Carolina policyholder who opted out could be sued and actually *lose* money.   In effect, the Notice said to South Carolinians, "Stay in the settlement and take money to which

you're not entitled, or opt-out, take nothing, and risk getting sued and losing money."  To someone unaware of the *Ward* decisions, the Settlement's terms may have seemed like the best possible outcome a policyholder could obtain, rather than a compromise.

This was precisely how Mr. Hege understood the Notice.  (*See* Hege Aff., ECF No. 28-2).  Mr. Hege stated that had he been made aware of *Ward*, he would have opted out of the settlement and pursued his own case.  (*Id*. ¶ 14.)  Indeed, Mr. Hege's objection letter demonstrates that he remained in the class for fear of being sued if he opted out.  (*See* Hege Letter 1, ECF No. 28-9.)  The notice afforded to Plaintiffs thus misinformed them of the value of their rights if they opted out and the relative value of remaining in the settlement.  As such notice was materially misleading, accordingly, this Court concludes that the *Runyan* court's exercise of jurisdiction over Plaintiffs violated Plaintiffs' due process rights.[10]

---

[10]  This Court expresses no opinion on the substantive fairness of the terms of the settlement itself.  Such a determination was the province of the *Runyan* court and, more importantly, the class members deciding whether to opt out.  It was therefore essential that the Notice enabled Plaintiffs to make an informed choice.  By citing to a South Carolina statute, but omitting other relevant authorities, the Notice provided Plaintiffs with a misleading picture of the law governing their Policy, thereby depriving them of the ability to make an informed choice.

As Transamerica points out, Mr. Hege did have an attorney, Tim Merrell, review the Notice before Plaintiffs decided not to opt out.  (*See* Tr. of Video Dep. of Stephen K. Hege 34:11–35:16, ECF No. 29-2.)  Transamerica argues that this "eviscerates" any argument that notice was inadequate.  (Reply Mem. 2, ECF No. 29.)  This Court disagrees.  Mr. Merrell served as Plaintiffs' estate planning lawyer.  (Tr. of Video Dep. of

### B. Adequacy of Representation

Although the notice deficiency alone is reason enough for the *Runyan* Order to have no preclusive effect on Plaintiffs, *see Stephenson*, 273 F.3d at 261 n.8; *Homeside Lending, Inc.*, 826 A.2d at 1018, this Court also concludes that the representation Plaintiffs received was constitutionally inadequate.  Adequacy of representation is generally considered to be the most important *Shutts* due process requirement.  *See Linder v. Litton Sys., Inc.*, 81 F.R.D. 14, 19 (D. Md. 1978); *Werlinger v. Champion Healthcare Corp.*, 598 N.W.2d 820, 827 (N.D. 1999) (adequacy of representation is of "critical importance").  Both class counsel and the class representatives must adequately represent the absent class plaintiffs at all times.  *See Homeside Lending, Inc.*, 826 A.2d at 1012; *Glassell v. Ellis*, 956 S.W.2d 676, 684 (Tex. Ct. App. 1997).  As the phrase "at all times" from *Shutts* indicates, the "duty to represent absent class members adequately is a continuing one."  *Matshushita*, 516 U.S. at 396 (Ginsburg, J., concurring in part and dissenting in part (citing *Shutts*, 472 U.S. at 812)); *see also Gonzales*, 474 F.2d at 75

---

Stephen K. Hege 34:20, ECF No. 29-2.)  Plaintiffs contacted Mr. Merrell about the Notice because they wanted to know whether they would lose their insurance coverage by joining *Runyan*.  (Dep. of Stephen K. Hege 22:13–22:23, ECF No. 29-1.)  The party producing the notice documents has the burden of providing informative, accurate notice to class members.  Even if this Court were to agree that a notice deficiency could be cured by a class member receiving advice of counsel, this Court would not accept that Plaintiffs' limited discussion with an estate planning lawyer cured the defects in the *Runyan* notice.

*A.A.A.*

(representative's failure to pursue an appeal rendered initially adequate class representation inadequate, such that judgment did not bind the class).

One aspect of the adequacy requirement involves the attorneys for the class. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) ("adequacy heading also factors in competency and conflicts of class counsel"). "An attorney for the class must be loyal to each member of it, and not act based on interests antagonistic to it." *Homeside Lending, Inc.*, 826 A.2d at 1013; *see also Glassell*, 956 S.W.2d at 685 ("Class counsel must serve the interests of the *entire* class"). "Class members must have some remedy if inadequacy develops after they have remained in the class in reliance on the actions of the court and class counsel." *Homeside Lending, Inc.*, 826 A.2d at 1017. Here, that remedy is a collateral challenge to the binding effect of the judgment rendered under such deficient representation.

The record before this Court indicates an antagonistic relationship between the interests of *Runyan* Class Counsel and Plaintiffs. In particular, the sizeable attorneys' fee, upon which *Runyan* Class Counsel and Transamerica agreed before *Runyan* began, created an intractable conflict of interest. (*See* Leventhal Decl. 3, ECF No. 20-9.) Although the conflict of interest created by attorneys' fees in a class action settlement does not render the attorneys' representation inadequate *per se*, representation can be constitutionally inadequate when that conflict of interest is exacerbated by other factors. *See, e.g.*, *Homeside Lending, Inc.*, 826 A.2d at

1013 (finding constitutionally impermissible conflict of interest where attorneys'
fees came out of class recovery and defendant had agreed not to contest attorneys'
fees up to a certain amount).  Several such factors were present in *Runyan*.

First, the antagonistic effect of the predestined fee was compounded by the
fact that Transamerica agreed not to contest *Runyan* Class Counsel's fee.  The
Settlement Agreement contained a "clear sailing" clause, which is an agreement
under which a defendant who will pay the attorney's fees agrees not to contest a
fee award within a specified maximum amount.  *See Homeside Lending, Inc.*, A.2d
at 1015 n.17.  The problems those clauses create have been summarized as
follows:

> A "clear sailing" clause has two adverse effects that cause
> substantial doubt on the legitimacy of its use.  First, it deprives the trial
> court and a reviewing court of the certainty of having the propriety of
> the fee request tested in the adversary process. . . .  Second, the
> clause creates the likelihood that plaintiffs' counsel, in obtaining the
> defendant's agreement not to challenge a fee request within a stated
> ceiling, will bargain away something of value to the plaintiff class.  It
> is unlikely that a defendant will gratuitously accede to the plaintiffs'
> request for a "clear sailing" clause without obtaining something in
> return.  That something will normally be at the expense of the plaintiff
> class.

*Malchman v. Davis*, 761 F.2d 893, 907–08 (2d Cir. 1985) (Newman, J.,
concurring) (internal citations omitted); *see also Weinberger v. Great N. Nekoosa
Corp.*, 925 F.2d 518, 524 (1st Cir. 1991) (finding that defendant's "agreement not
to contest fees up to a stated maximum exacerbated the potential conflict of
interest between the plaintiff class and class counsel").

The Settlement Agreement in *Runyan* provided that Transamerica would pay *Runyan* Class Counsel $3,500,000 and that, so long as *Runyan* Class Counsel did not seek a larger award or the *Runyan* court did not grant one, Transamerica would not contest the award.   (Settlement Agreement 25–26, ECF No. 20-16.)   As Transamerica would benefit from the settlement by limiting its potential exposure to adverse judgments, its goal was to get the *Runyan* court's imprimatur on the Settlement Agreement as quickly and cheaply as possible.   That goal could be furthered by creating an incentive for *Runyan* Class Counsel to stop seeking the full measure of their clients' damages.   Hence, the clear sailing clause, which presented *Runyan* Class Counsel with an opportunity to receive $3,500,000 for relatively little additional effort—effort that would be aided by their clients' adversary.   By *Runyan* Class Counsel agreeing to the clear sailing clause before the *Runyan* action was even filed, Class Counsel had no motivation at any point in that action to engage Transamerica in any adversarial manner.   Instead, it was in *Runyan* Class Counsel's interest to defend the settlement against any claims of unfairness or other actions that might jeopardize their sizeable fee, even if the objections to the settlement came from the class members they were meant to represent, and surrender all control over the proceedings to Transamerica.   Consequently, *Runyan* Class Counsel's collective interest became aligned with that of Transamerica in every meaningful sense.

Second, with the clear sailing clause in place, *Runyan* Class Counsel began opposing all dissension to the settlement.  Instead of proceeding to judgment in any of the pending federal cases, Class Counsel worked with Transamerica to prevent any such judgment.  Shortly after Class Counsel filed the *Runyan* complaint, they and Transamerica jointly moved to stay the federal actions, pending the *Runyan* court's approval of the settlement.  This effectively ended the federal actions, clearing the way for Class Counsel to push for approval of the settlement.

Once the federal cases were stayed, *Runyan* Class Counsel actively opposed the arguments of the South Carolina objectors, who sought protection as a subclass after learning of the material defects in the Notice and their rights under South Carolina law.  (*See* Tr. of Hr'g 25:1–26:4, Nov. 9, 2009, ECF No. 28-22.)  One member of *Runyan* Class Counsel specifically denied that the Notice was defective. (*Id*.)  Instead, he and other *Runyan* Class Counsel argued in favor of a settlement agreement that would allow Transamerica to pay Plaintiffs less than half of what they were owed under applicable law, while *Runyan* Class Counsel would receive an attractive sum.

Finally, *Runyan* Class Counsel's conduct after the *Gooch* court certified a national class and granted that class summary judgment approached outright hostility to the *Runyan* class members.  Rather than seizing on the opportunity to obtain greater sums for their clients through *Gooch*, *Runyan* Class Counsel

continued to advocate an outcome that, in all likelihood, would be substantially less lucrative for Plaintiffs and Class Members.

In January 2010, two class members who had previously attempted unsuccessfully to intervene filed a motion asking the *Runyan* court to reconsider its settlement Order in light of the *Gooch* order that had been issued the same day. The class members suggested that the *Runyan* court vacate its Order, subject to reinstatement if the Sixth Circuit reversed the *Gooch* district court's order. In a January 19, 2010, hearing on this motion, *Runyan* Class Counsel, along with Defendant, argued *against* reconsideration. Significantly, one *Runyan* Class Counsel member argued against reconsideration on the merits, and he further argued that the class members lacked standing to bring the motion. (Tr. of Hr'g, 15:10−16:24, Jan. 19, 2010, ECF No. 28-27.)

Part of the reason these two class members lacked standing is that *Runyan* Class Counsel argued against their motions to intervene. In fact, having successfully opposed all attempts to intervene, *Runyan* Class Counsel and the class representatives were the only ones who had standing to seek a more favorable result for the class. Furthermore, they were the only ones with both the duty and the opportunity to advocate for the class. Instead of taking that opportunity, they vigorously opposed it. In other words, *Runyan* Class Counsel argued *against* their clients recovering 100% of they were owed. The only plausible motivation for such conduct is the $3,500,000 fee *Runyan* Class Counsel expected to receive.

*G.R.A.*

Page 36 of  47

Transamerica contends that *Runyan* Class Counsel had no duty to ask the *Runyan* court to vacate the Order after the *Gooch* court entered its order. (Reply Mem. 15.) It argues that judgments like that of *Gooch* will cause Defendants to raise premium rates, thereby "harming" most class members by "making their premium rates unaffordable and causing economic hardship and loss of coverage." (*Id*.) For this argument to be relevant to the present inquiry, one must assume that such a "harmful" outcome likely would have occurred and further assume that *Runyan* Class Counsel supported the settlement (and later, the *Gooch* Order) in order prevent that harmful outcome. The Court rejects such speculation.[11] The fact is, *Runyan* Class Counsel had an opportunity to seek full relief for their clients, with merely a *possibility* that premiums would become cost-prohibitive in the future. Meanwhile, the Settlement Agreement capped past claimants' recovery at the lesser of 40% or $15,000, but it gave no guarantee that premiums *would not* ever increase in order to offset settlement costs. In other words, the spectre of increased premiums was present in either case;[12] the only real difference was the how much money policyholders could receive. Nonetheless, *Runyan* Class Counsel

---

[11]     Even accepting Transamerica's invitation to pile assumption upon assumption, if obtaining favorable judgments would end up harming policyholders, one is left wondering why *Runyan* Class Counsel had pursued damages claims in six other cases to begin with.

[12]     The settlement provided only a temporary rate freeze. Transamerica agreed not to apply for any additional rate increases in 2009, but it made no promises regarding subsequent years. (Notice 7, ECF No. 28-7.)

erroneously elected to defend the decision that resulted in their clients receiving less.

As mentioned above, *Shutts* requires that representation be adequate "at all times." Accordingly, *Runyan* Class Counsel could have at least attempted to get their clients increased relief in *Gooch*. They failed to do so.

In sum, there is ample evidence that Class Counsel placed their own interests above those of the class they purported to represent. Reviewing a settlement with identical representation problems, the *Homeside Lending* court stated as follows:

> We stress that class counsel had duties of loyalty to each class member. They could not claim that it was acceptable to deny recovery for one class member in order to provide a greater recovery for another—that is, to allocate benefits and burdens among the class members to ensure that they had an easy and efficient way to collect their fees.

*Homeside Lending, Inc.*, 826 A.2d at 1015. *Runyan* Class Counsel's representation of Plaintiffs was inadequate under *Shutts*. Accordingly, even assuming that the *Runyan* class representatives fulfilled their duty toward Plaintiffs, this Court concludes that Plaintiffs were not afforded representation sufficient to make the *Runyan* court's exercise of jurisdiction comport with due process. Based on these failures to fulfill the *Shutts* due process requirements, this Court concludes that the *Runyan* Order is not entitled to full faith and credit.

**III.    Preclusive Effect of *Runyan* Order under Arkansas Law**

Independent of the due process deficiencies discussed above, the Court further finds that the *Runyan* Order has no preclusive effect because the *Runyan* court's exercise of subject matter jurisdiction was invalid under Arkansas law and because the settlement action was never the subject of good faith adversarial litigation between the named plaintiffs and Transamerica before *Runyan* court. *See Council of Co-Owners for the Lakeshore Resort & Yacht Club Horizontal Prop. Regime v. Gleyneu, LLC*, 240 S.W.3d 600, 604 (Ark. 2006). Under Arkansas law, the affirmative defense of *res judicata* involves the establishment of five elements: "(1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) the first suit was fully contested in good faith; (4) both suits involve the same claim or cause of action; and (5) both suits involve the same parties or their privies." *Id.* at 604; *see also Jayel Corp. v. Cochran*, 234 S.W.3d 278, 281 (Ark. 2006). This Court finds that Transamerica has not established its entitlement to the *res judicata* defense because the second and third elements are lacking.

Amendment 80, § 6 to the Arkansas constitution, like Article III of the U.S. Constitution, confers subject matter jurisdiction only over "justiciable matters." *See Foster v. Hill*, 275 S.W.3d 151, 154 (Ark. 2008) (citing Ark. Const. amend. 80, § 6). A justiciable controversy exists only when the parties are adverse to one another when the suit is initiated. *See, e.g.*, *United States v. Johnson*, 319 U.S. 302, 305 (1943) (holding that dismissal of a case is proper when there is no

adversity between the parties); *Muskrat v. United States*, 219 U.S. 346, 361 (1911) (holding that an action brought "to obtain a judicial declaration of the validity of the act of Congress" is not a justiciable controversy to which judicial power may extend).  In *Poe v. Ullman*, 367 U.S. 497 (1961), the United States Supreme Court explained:

> The Court has found unfit for adjudication any case that "is not in any real sense adversary," that "does not assume the 'honest and actual antagonistic assertion of rights' to be adjudicated—a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to the adjudication of constitutional questions by this Court."

*Id.* at 505 (quoting *Johnson*, 319 U.S. at 305).

In *Johnson*, the Supreme Court dismissed a "consent action" where the non-adversarial character of the suit stemmed from the absence of disagreement by the parties, who had specifically arranged to file the suit to bring about a result in furtherance of the defendant's economic interests. *Johnson*, 319 U.S. at 305; *see also Cleveland v. Chamberlain*, 66 U.S. 419, 423 (1861) ("Where there is a pretended dispute between parties merely nominal, *it is a fraud upon the court*, even where the object is to get an opinion for the benefit of the parties themselves; but if the purpose be to injure third parties by collusion between those who are named in the record, it would be scandal to the administration of justice to let it go on.") (emphasis added)).

*A.R.A.*

Page 40 of  47

The evidence, which includes sworn statements, pleadings, and statements made in open court by counsel involved in those proceedings, indicates there was never a case or controversy or actual adversity between the *Runyan* plaintiffs and the defendants in the Arkansas circuit court when that settlement action was filed or at any time thereafter.  Addressing justiciability within the context of declaratory judgment actions involving parties asking for conflicting determinations of rights or other obligations, Arkansas's highest court has held: "Where the parties are in agreement on an issue, an action for declaratory judgment may not be maintained because there is no controversy between persons whose interests are adverse." *MacSteel Div. of Quanex v. Ark. Okla. Gas Corp.*, 210 S.W.3d 878, 886–87 (Ark. 2005).

The record before this Court shows that Transamerica's lead counsel in the *Runyan* action made statements in open court that no litigation was ever intended to occur within that proceeding.  (*See* Tr. of Hr'g 6:16–6:18, April 23, 2009, ECF No. 28-16 (Mr. Leventhal: "Why we are here before this Court is essentially a procedural matter. We wanted to have a global resolution."))   Counsel also confirmed in his own affidavit that a mutual understanding as to the "major terms of a class action settlement," subject to reducing those terms to a formal agreement, was reached on March 3, 2009, *before* the *Runyan* Complaint was filed. (*See* Leventhal Decl. ¶¶ 7–8, ECF No. 20-9). *Runyan* Class Counsel independently confirmed the substantive settlement occurred *before* their filing of the complaint

in state court.  (*See* Tr. of Hr'g Nov.9, 2009, at 45:6–45:8, ECF No. 28-23 (Mr. Bohrer: "This case was not finished in terms of an agreed-upon settlement until, I want to say, March or February 2009."))

After carefully surveying Arkansas law, this Court finds that without adverse interests when the *Runyan* settlement action was filed on March 13, 2009,[13] the Arkansas circuit court lacked proper jurisdiction to entertain the suit in the first instance.  *See MacSteel*, 210 S.W.3d at 886–87 (holding that where the parties agreed on an issue, there is no true controversy between two parties with adverse interests); *Jegley v. Picado*, 80 S.W.3d 332, 343 (Ark. 2002) (requiring as a matter of subject matter jurisdiction that the action involve a legitimately controverted matter between parties with adverse interests). The court's function was reduced to the role of superintending a preexisting contract reached between two parties who sought nothing more than to use that court to bind non-parties (most of whom were not Arkansas residents) to their agreement.  Such conduct amounts to fraud on the court.  *See Cleveland v. Chamberlain*, 66 U.S. 419, 423 (1861).

Avoiding the adversarial process was something that the *Runyan* Class Counsel actively sought, noting that the Arkansas circuit court action, having been brought solely for settlement purposes, was not the place for "contested litigation."

---

[13]    The fact that the named *Runyan* plaintiffs had litigation pending before other courts does not cure the jurisdictional defect.  Subject matter jurisdiction is determined at the instant the suit is filed.  *See, e.g.*, *Johnson*, 319 U.S. at 302.

(*See* Tr. of Hr'g 45:6–45:8, Sept. 17, 2009, ECF No. 28-26 (Mr. Baudin: "Allowing interventions in a class settlement setting such as this would . . . promote . . . contested litigation."))    The record before the Arkansas circuit court includes repeated instances where *Runyan* Class Counsel allowed Transamerica to conduct the entire proceeding.  For example, in the April 23, 2009 hearing for preliminary approval of the pre-filing settlement, lead counsel for Transamerica presented the settlement, argued for its initial approval, and asked for the class to be certified with no meaningful involvement from Class Counsel, other than his indication of his agreement for preliminary approval.  The entire hearing for preliminary approval lasted just long enough to fill twelve (12) pages of transcript.  *Runyan* Class Counsel spoke just enough to fill one (1) page of that transcript.  (*See* Tr. of Hr'g 13:8–14:10,  Apr. 23, 2009, ECF No. 28-16.)

From the inception of the *Runyan* settlement action, the only discernable effort exerted by *Runyan* Class Counsel was to initiate the suit (which only they alone could do and which they did by virtue of their agreement with Transamerica), in exchange for a $3,500,000 attorney fee.  *Runyan* Class Counsel's conduct prior to entry of the *Runyan* Order highlights exactly why Arkansas, like Article III and cases examining subject matter jurisdiction in the federal system, expressly requires the existence of a justiciable controversy as a precondition to circuit court subject-matter jurisdiction.  The record before this Court, therefore, precludes any notion

that there was a "justiciable matter" under Amendment 80, § 6 of the Arkansas Constitution when the *Runyan* complaint was filed on March 13, 2009.

This Court is not persuaded by Judge Leon Holmes' opinion in *Hall v. Equity National Life Insurance Co.*, 2010 WL 2735281 (E.D. Ark. July 9, 2010), on which Transamerica relies.  Argument presented by Plaintiffs in the present case relates to a subject matter jurisdiction challenge to the validity of the *Runyan* order on the basis of the United States Constitution and the Constitution of the State of Arkansas.  Nowhere in the *Hall* Order does the court address even the most preliminary aspects of those jurisdictional challenges raised by Plaintiffs in this case.

Nor is this Court persuaded by Transamerica's reference to *S.E.C. v. Randolph*, 736 F.2d 525 (9th Cir. 1984), *Presidential Life Insurance Co. v. Milken*, 946 F. Supp. 267 (S.D.N.Y. 1996), or *Continental Assurance Co. v. Macleod–Stedman, Inc.*, 694 F. Supp. 449 (N.D. Ill. 1988).  None of those cases involve the peculiar factual record and circumstances that exist here surrounding this particular pre-litigation agreement or the precise manner in which Transamerica and *Runyan* Class Counsel superintended that agreement through the Arkansas court system.  For example, none of these cases include, among other things, an agreement so complete and a unity of interests so strong that *Runyan* Class Counsel argued *against* the clear interests of class members as discussed above.

The foregoing cases likewise do nothing to address Arkansas' long-standing prohibition against successive declaratory judgment actions.  Under Arkansas law,

*A.A.A.*

Page 44 of  47

a circuit court is precluded from entertaining a declaratory judgment action (which was one type of relief sought in the *Runyan* complaint) when there is preexisting litigation between the same parties. *See City of Fort Smith v. Didicom Towers, Inc.*, 209 S.W.3d 344, 348 (Ark. 2005); *UHS of Ark. v. Charter*, 759 S.W.2d 204, 206 (Ark. 1998) ("[W]hen another action between the same parties, in which all issues could be determined, is actually pending at the time of the commencement of an action for a declaratory judgment, the court abuses its discretion when it entertains jurisdiction.") (internal citations omitted). Under Arkansas law, this is a jurisdictional matter, meaning that the second court entertaining the declaratory action in duplication of another matter has no subject matter jurisdiction to hear the case. *See Hooker v. Deere Credit Servs., Inc.*, 971 S.W.2d 267, 270 (Ark. Ct. App. 1998). Each of the plaintiffs in the *Runyan* action had previously filed cases pending in federal district courts seeking the same declaratory relief they then sought in Arkansas circuit court. Accordingly, under Arkansas law, the *Runyan* court had no separate subject matter jurisdiction to entertain the action.

Given this Court's review of the parties' filings in this case, including, without limitation, relevant parts of the *Runyan* circuit court record, and after carefully considering the parties' arguments under Arkansas law, this Court holds that the *Runyan* Order (ECF No. 20-3) is not entitled to preclusive effect. *See Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985), *Kremer*, 456 U.S. at 466. "It is well settled that a court adjudicating a class action cannot

*A.R.A.*

Page 45 of 47

predetermine the *res judicata* effect of its own judgment; that can only be determined in a subsequent suit." *Pelt v. Utah*, 539 F.3d 1271, 1285 (10th Cir. 2008).

Based on the unique circumstances present in this case, this Court likewise concludes that Transamerica has failed to show that the *Runyan* action was fully contested in good faith by class counsel at any time during the pendency of that case. *See Martin v. Bobo*, 292 S.W.3d 865, 868 (Ark. Ct. App. 2009). Indeed, the undisputed evidence presented to this Court shows that the suit was never "fully contested" at all by the named parties to the proceeding. While persons attempted to intervene and therefore *become* a named party with standing, which would have created true adversity between the parties, Transamerica and *Runyan* Class Counsel together successfully argued against their intervention. It therefore remained the case throughout the entirety of the *Runyan* proceedings that the alignment of interests between the actual parties thereto—namely, the *Runyan* named plaintiffs and Transamerica—remained unbroken. This absence of any adversity between the named parties is fatal to Transamerica's affirmative defenses. As with subject matter jurisdiction, genuine adversity at the filing of suit is indispensable under Arkansas law to this "good faith" requirement. *See Nat'l Bank of Commerce v. Dow Chem. Co.*, 1 S.W.3d 443, 448 (Ark. 1999) (holding that "voluminous briefs, discovery materials, and oral arguments" occurring in adversarial

litigation between parties in a proceeding established that the suit had been "fully contested in good faith").

In light of the significant constitutional deficiencies in *Runyan* concerning due process, this Court concludes that the *Runyan* Order is not entitled to full faith and credit. The Court also finds, however, that even if such deficiencies did not exist, the *Runyan* Order has no preclusive effect under Arkansas law because the Arkansas circuit lacked proper subject matter jurisdiction and because the suit before that court was not fully contested in good faith. For each of these separate and alternative reasons, the Court holds that the Defendants are not entitled to judgment as a matter of law on the defenses presented in its motion.

**IT IS THEREFORE ORDERED THAT** Defendant Transamerica's Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

G. Ross Anderson, Jr.
Senior United States District Judge

January __21__, 2011
Anderson, South Carolina

Page 47 of 47