UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
AIKEN/ANDERSON/SPARTANBURG DIVISIONS

| | | |
|---|---|---|
| Hege, *et al.* v. Aegon USA, LLC, *et al.* | ) | C/A No.: 8:10-cv-1578-GRA |
| | ) | |
| Bowman v. Aegon USA, LLC, *et al.* | ) | C/A No.: 7:10-cv-1630-GRA |
| | ) | |
| Miller v. Aegon USA, LLC, *et al.* | ) | C/A No.: 7:10-cv-1631-GRA |
| | ) | |
| Bridgmon v. Aegon USA, LLC, *et al.* | ) | C/A No.: 1:10-cv-1635-GRA |
| _____ | ) | |

**<u>ORDER</u>**
(Written Opinion)

These matters are before the Court on Plaintiffs' Motion to Compel and Omnibus Motion to Compel Production of Documents (collectively the "Motions to Compel"), and Defendant Transamerica Life Insurance Company ("Transamerica")'s Motion for Protective Order.[1]  Through their Motions to Compel, Plaintiffs seek production of documents Transmerica claims are protected by attorney–client privilege and the work product doctrine.  Meanwhile, in its Motion for Protective Order, Transamerica seeks to prevent Plaintiffs' counsel from eliciting certain testimony from one of its actuaries. For the reasons set forth herein, Plaintiffs' Motions to Compel are granted.  Transamerica's Motion for Protective Order is granted in part and denied in part.

---

[1]  Plaintiffs and Transamerica have filed their respective motions in each of the above-captioned cases.

**Background**

These cases arose out of a 2005 decision by Life Investors Insurance Company ("Life Investors"), a predecessor of Transamerica,[2] to change the payment methodology for its supplemental cancer policies. The policies pay claims based on the "actual charges" the policyholder incurs for certain treatments. Before the change, Life Investors paid benefits according to the amount the insured's healthcare provider initially billed the insured, even if the provider later accepted a lesser amount as payment in full. However, after April 1, 2006, Life Investorspaid benefits based on the amount the provider accepted as payment in full, even if that amount was less than the amount it initially billed.

For many years, Life Investors and its predecessors sold supplemental cancer policies that offered uncapped benefits for chemotherapy and radiation treatment. Due to the rising costs of those treatments, Life Investors eventually stopped selling the policies; however, because a number of the policies that had already been issued were guaranteed renewable for the insured's lifetime, Life Investors continued to service a substantial block of these policies. These remaining policies were referred to as Discontinued Supplemental Insurance ("DSI") policies.

As the pool of DSI policyholders shrank over time, the loss ratio on DSI policies likewise grew. To compensate for the increasing loss ratio, Life Investors

---

[2]     Effective October 2, 2008, Life Investors merged into Transamerica. Unless otherwise indicated, all references to Transamerica in this Order include Life Investors.

imposed several premium rate increases on DSI policyholders. In April 2004, Life Investors convened a taskforce (the "DSI Taskforce" or "Taskforce") to identify the causes of the high loss ratio and consider ways to avoid or mitigate future premium increases. The Taskforce was chaired by Stephen Gwin, an actuary, and included members of Life Investors' legal, actuarial, financial, and claims departments.

After initial review, the Taskforce determined that because Life Investors paid claims according to the amount medical providers billed, it was often paying DSI policyholders more than providers actually accepted. The Taskforce also concluded that the phrase "actual charges" in the DSI policies meant that Life Investors had to pay only the amount that a provider actually accepted as payment in full. Over the summer and fall of 2004, Taskforce members consulted with both in-house and outside counsel regarding various issues related to the Taskforce's proposed interpretation of "actual charges."[3]

In October 2004, Life Investors retained the law firm of Jorden Burt LLP ("Jorden Burt") to analyze the legality of the proposed change and the risk that Life Investors would face litigation if it made the change. At Jorden Burt's request, Gwin

---

[3]   Defendants maintain that Life Investors did not changes its interpretation of "actual charges" but instead merely amended its claims processing requirements. At least one other court hearing a case against Life Investors has squarely rejected that proposition. *See Lindley v. Life Invs. Ins. Co. of Am.*, No. 08-cv-379, 2009 WL 2163513, at *6 (N.D. Okla. Jul. 17, 2009) ("While defendant may call this a revision in claim procedures, it also reflects a change in its interpretation of 'actual charges.'").

performed analyses and calculations on the financial impact the proposed change would have on DSI policy funds and premiums. Gwin memorialized his work in a series of charts and tables (collectively, the "Gwin Charts" or "Charts"), which he provided to Jorden Burt. In April 2005, Jorden Burt completed its opinion and risk assessment, which it provided to Life Investors in a 185-page report (the "Jorden Burt Report"). In early 2005, the DSI Taskforce presented its findings and recommendations to Connie Whitlock, Life Investors' Senior Vice President. Whitlock also received a copy of the Jorden Burt Report. In July 2005, Whitlock adopted the Taskforce's proposal and decided to change Life Investors' DSI payment methodology; going forward, claims would be paid according to the amount healthcare providers accepted as full and final payment. Whitlock announced her decision in an internal memorandum dated July 22, 2005.

After the change became effective in 2006, a number of policyholders sued Life Investors over the change. Jorden Burt represented Transamerica in a number of the "actual charges" cases. In 2008, at Jorden Burt's request, Gwin performed additional analyses and calculations for Jorden Burt to use in mediation and settlement negotiations.

### Procedural History

Transamerica filed its Motion for Protective Order in these matters on February 25, 2011. Plaintiffs filed their Motions to Compel on February 28 and March 3. On March 8, the Court directed the parties to attempt to resolve their dispute over the

documents Plaintiffs sought in their Motions to Compel; if they could not totally settle the dispute, the Court would conduct *in camera* review of any remaining documents.

Although the parties resolved their dispute with respect to the majority of documents, they did not agree on the discoverability of others. On April 8, 2011, Transamerica delivered to chambers copies of the following documents, over which the parties could not agree:

- Internal Life Investors emails regarding analysis of the "actual charges" language on the DSI policies, dated July 8, 2004 (TLICPriv-0013, a/k/a LIPriv-Lindley 0021), and July 9, 2004 (TLICPriv-0014, a/k/a LIPriv-Lindley 0065, and TLICPriv-0015, a/k/a LIPriv-Lindley 0105);

- A string of emails between Life Investors employees and outside attorneys regarding analysis of DSI claims processing, dated October 25, 2004 (TLICPriv-0063, a/k/a LIPriv-Lindley 0027);

- A list of questions regarding the proposed change in claims payment, prepared by Life Investor's General Counsel Mark Edwards (TLICPriv-0004, a/k/a LIPriv-Lindley 0168), and an email dated May 20, 2004, forwarding those questions to other Life Investors personnel (TLICPriv-0005, a/k/a LIPriv-Lindley 0169);

- Handwritten notes taken by Stephen Gwin and Kelly Adams, a Life Investors vice president, at a May 27, 2004 meeting regarding the proposed change in claims payment (TLICPriv-0255, a/k/a LIICA 005158, and TLICPriv-0256, a/k/a LIICA 005171);

- The "Financial Analysis" section of the Jorden Burt Report and Exhibits B and D–O to the Report (TLICPriv-0198);

- The Gwin Charts (TLIC-Priv-0114, TLIC-Priv-0115, TLIC-Priv-0127, TLIC-Priv-0133, TLIC-Priv-0177, TLIC-Priv-0178, TLIC-Priv-0179, TLIC-Priv-0180, TLIC-Priv-0181, TLIC-Priv-0197, TLIC-Priv-0204, TLIC-Priv-0241, TLIC-Priv-0242, TLIC-Priv-0243, TLIC-Priv-0244, TLIC-Priv-0245, TLIC-Priv-0246, and TLIC-Priv 0247); and

- A draft of Whitlock's internal memorandum dated May 26, 2005, with attached fax cover sheet (TLICPriv-0231, a/k/a LIPriv-Lindley 0131).

The parties filed statements outlining the grounds of dispute for each document, as well as responses to the pending motions.

## Discussion

I.   **Motions to Compel**

Parties to civil litigation have broad discovery rights. They may obtain discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense," including any information that "appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Courts are to construe broadly rules enabling discovery. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Murray Sheet Metal Co.*, 967 F.2d 980, 983 (4th Cir. 1992) ("*National Union*") (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)). Conversely, limitations on discovery are to be construed narrowly. *See, e.g.*, *Hawkins v. Stables*, 148 F.3d 379, 383 (4th Cir. 1998) ("[T]he attorney–client privilege is to be narrowly construed . . . ."); *RLI Ins. Co. v. Conseco, Inc.*, 477 F. Supp. 2d 741, 748 (D. Md. 2007) ("[A]ssertions of evidentiary privilege are narrowly and strictly construed . . . ." (citing *Trammel v. United States*, 445 U.S. 40, 50–51 (1980))).

Transamerica asserts both attorney–client privilege and work product immunity over each document remaining in dispute. Because Transamerica could avoid production under either theory, this Court addresses each argument separately.

### A.     Attorney–Client Privilege

These cases are diversity actions. In such cases, the availability of an evidentiary privilege is governed by the law of the forum state. Fed. R. Evid. 501; *Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 107 n.5 (4th Cir. 1995). Thus, this Court shall apply South Carolina law to Transamerica's assertions of attorney–client privilege.

"The attorney–client privilege protects against disclosure of confidential communications by a client to his attorney." *State v. Owens*, 424 S.E.2d 473, 476 (S.C. 1992) (citing *State v. Love*, 271 S.E.2d 110 (S.C. 1980)). The privilege is to be construed strictly, *State v. Doster*, 284 S.E.2d 218, 219 (S.C. 1981), and balanced against the public interest in the proper administration of justice, *id.* at 220 (citing *NLRB v. Harvey*, 349 F.2d 900 (4th Cir. 1965); *Sepler v. State*, 191 So. 2d 588 (Fla. Dist. Ct. App. 1966)). Furthermore, not every communication within the attorney and client relationship is privileged. *Id.* at 219. The communication must relate to a fact of which the attorney was informed by her client, outside the presence of strangers, for the purpose of securing primarily an opinion on law, legal services, or assistance in some legal proceeding. *Marshall v. Marshall*, 320 S.E.2d 44, 47 (S.C. Ct. App. 1984) (internal citations omitted).

The privilege consists of the following essential elements: (1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by

the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except where the protection is waived. *Tobaccoville USA, Inc. v. McMaster*, 692 S.E.2d 526, 529 (S.C. 2010) (citing *Doster*, 284 S.E.2d at 219–20). The party asserting the privilege has the burden of proving every element. *See Love*, 271 S.E.2d at 112 (citing 81 Am. Jur. 2d *Witnesses* § 221).

Under South Carolina law, the party asserting the privilege must establish lack of waiver. *City of Myrtle Beach v. United Nat'l Ins. Co.*, No. 4:08-1183-TLW-SVH, 2010 WL 3420044, at *5 (D.S.C. Aug. 27, 2010) (applying South Carolina law); *Tobaccoville USA, Inc.*, 692 S.E.2d at 529. Waiver may be either explicit or implied. *See Floyd v. Floyd*, 615 S.E.2d 465, 484 (S.C. Ct. App. 2005). One way a party may implicitly waive the privilege is by placing a privileged communication "at issue" in a case. For example, in *Floyd*, a defendant facing a claim of breach of fiduciary duty argued that his actions were reasonable and made "several general attestations" that he had acted on advice of counsel. Such attestations were sufficient to place his communications with counsel at issue, thereby waiving the privilege. *Id.*

Assuming, without deciding, that Transamerica has met its burden on the other elements of attorney–client privilege, it nonetheless has given short shrift to this element.[4] First, it contends waiver is established because although Plaintiffs

---

[4]   Indeed, Transamerica omitted waiver from its recitation of the privilege's elements. (*See* Transamerica's Resp. 7, *Hege* ECF No. 87; Transamerica's Resp. 7, *Hege* ECF No. 88.)

initially asserted waiver in their Motions to Compel, they have not identified waiver as a basis for continued dispute over the remaining documents. Transamerica's contention misses the point. Even if Plaintiffs have somehow abandoned their waiver argument,[5] such abandonment does not, *ipso facto*, establish the element for Transamerica. It still bears the burden of proving every element of the privilege, including lack of waiver. *See Wilson v. Preston*, 662 S.E.2d 580, 585 (S.C. 2008) (citing *Love*, 271 S.E.2d at 110).

Second, Transamerica argues it has not waived the privilege because it has never raised advice of counsel as an affirmative defense in these cases. Expressly claiming advice of counsel as an affirmative defense is not the only way to put privileged communications at issue. *City of Myrtle Beach*, 2010 WL 3420044, at *5. For example, in *City of Myrtle Beach*, an insurance bad faith action arising under South Carolina law, the defendant insurer asserted reasonableness and good faith as affirmative defenses, but it did not explicitly claim reliance on advice of counsel. The insured later sought production of communications between the insurer and its outside counsel regarding coverage. In analyzing the insurer's claim of privilege over those communications, the court noted that "[a]n insurer's thoughts and knowledge are at the center of a claim for bad faith." *Id.*, at *4. The court reasoned that "'when a litigant seeks to establish its mental state by asserting that it acted after

---

[5] The Court is not convinced such abandonment has, in fact, occurred. While Plaintiffs did not explicitly restated their waiver argument, they do continue to contest Transamerica's privilege claims.

investigating the law and reaching a well-founded belief that the law permitted the action it took, then the extent of its investigation and the basis for its subjective evaluation are called into question.'" *Id.*, at *5 (quoting *State Farm Mut. Auto. Ins. Co. v. Lee*, 13 P.3d 1169 (Ariz. 2000)). Accordingly, the court concluded, the insurer had put its communications with counsel at issue by asserting reasonableness and good faith. Thus, its privilege claim failed. *Id.*, at *7.

One element of a South Carolina insurance bad faith claim is that the refusal to pay resulted from the insurer's bad faith or unreasonable action. *See Howard v. State Farm Mut. Auto. Ins. Co.*, 450 S.E.2d 582, 586 (S.C. 1994). An insurer is to be judged by the evidence before it at the time it denied the claim or, if the insurance company did not specifically deny the claim, by the evidence it had before it at the time the suit was filed. *Id.* at 584.

Like the insurer in *City of Myrtle Beach*, Transamerica asserts, as affirmative defenses, that it acted in good faith and that its decision to change its payment methodology was reasonable. It also asserts that it engaged in no unlawful conduct and that it did not breach any common law or contractual duty owed to Plaintiffs. Under *Howard* and *City of Myrtle Beach*, Transamerica has put at issue the evidence Life Investors' decisionmakers had before them and the basis for their subjective evaluation.

When Whitlock learned policyholders were being paid more than healthcare providers were accepting as final payment, she asked for a "legal review." (Dep. of

Connie Whitlock, 317:16, Feb. 15, 2011, ECF No. 87-3.)  That legal review was part of the DSI Taskforce's work.  Furthermore, Whitlock and other management-level personnel received the Jorden Burt Report.  These facts indicate that the legal advice and analysis Life Investors sought and received was intertwined with the other considerations in play when Whitlock decided to change its "actual charges" payment methodology.  Accordingly, such advice and analysis bears upon the reasonableness of Life Investors' decision, which Transamerica has put at issue.  Applying that conclusion to *in camera* review of the disputed documents, this Court finds that Transamerica has put each of the remaining documents at issue, thereby precluding their protection under attorney–client privilege.

*In camera* review also reveals that some documents are not privileged for other reasons.  In October 2006, Gwin revealed to the Tennessee Department of Insurance some of the financial calculations that he performed for Jorden Burt and memorialized in the Gwin Charts.  Under South Carolina law, voluntary disclosure of a privileged communication to a third party waives attorney–client privilege not only as to the specific communication disclosed, but also as to all communications between the same attorney and the same client on the same subject.  *Marshall*, 320 S.E.2d at 46–47 (citing *United States v. Jones*, 696 F.2d 1069 (4th Cir. 1982); *Duplan Corp. v. Deering Milliken, Inc.*, 397 F. Supp. 1146 (D.S.C. 1975)).  Thus, assuming the Gwin Charts were ever privileged, Gwin's revelation to the Department waived the privilege for all of the Gwin Charts.

Furthermore, two disputed documents are nothing more than transmittal papers. For example, the email in TLICPriv-0005 transmits a document from an in-house attorney to other Life Investors employees. "Correspondence that merely transmit documents to or from an attorney, even at the attorney's request for purposes of rendering legal advice to a client, are neither privileged nor attorney work product." *Guidry v. Jen Marine LLC*, No. 03-0018, 2003 WL 22038377, at *2 (E.D. La. 2003). Therefore, the email in TLICPriv-0005 and the fax cover sheet in TLICPriv-0231 (a/k/a LIPriv-Lindley 0131) are not protected under either doctrine.

### B.    Work Product Doctrine

Federal law governs the work product doctrine in diversity cases. *United Coal Cos. v. Powell Constr. Co.*, 839 F.2d 958, 966 (3d Cir. 1988). Under Federal Rule of Civil Procedure 26(b)(3), things prepared "in anticipation of litigation" are generally protected from discovery, whether they were prepared by a party's attorney, consultant, or other agent. The party claiming work product protection has the burden of establishing entitlement to it. *Sandberg v. Va. Bankshares, Inc.*, 979 F.2d 332, 355 (4th Cir. 1992).

In evaluating a claim of work product protection, the first and central inquiry is whether the thing the party seeks to protect was prepared "in anticipation of litigation." A party often may prepare documents for multiple purposes, "not only out of a concern for future litigation, but also to prevent reoccurrences, . . . to respond to regulatory agencies," and for a variety of other reasons. *Nat'l Union*, 967

F.2d at 984. "Determining the driving force behind the preparation of each requested document is therefore required in resolving a work product immunity question." *Id.* The mere fact that litigation eventually ensues does not, by itself, cloak materials with work product immunity. "The document must be prepared because of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation." *Id.* (internal citations omitted); *see also Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 152 F.R.D. 132, 136 (N.D. Ill. 1993) ("[T]he anticipation of future litigation must have been the primary motivation which led to the creation of the documents. . . . Documents which do not refer to work product prepared by an attorney or other agent of a party to aid in forthcoming litigation, and which were generated in the ordinary course of business, are discoverable."); *Janicker v. George Washington Univ.*, 94 F.R.D. 648, 650 (D.D.C. 1982) (stating that, to fall within the protection of the privilege, "the primary motivating purpose behind the creation of a document or investigative report must be to aid in possible future litigation").

Under *National Union*, "a court must be satisfied that the document or tangible thing was not created during the ordinary course of business, . . . or for *any* non-litigation reason." *Suggs v. Whitiker*, 152 F.R.D. 501, 505–06 (M.D.N.C. 1993) (emphasis added) (citing *Nat'l Union*, 967 F.2d at 984). If the work would have been done in any event, it is not protected work product. *RLI Ins. Co. v. Conseco, Inc.*, 477 F. Supp. 2d 741, 747 (E.D. Va. 2007).

Here, Plaintiffs contend all the disputed documents were prepared in the ordinary course of business because they concerned the business purposes of identifying the causes of the high loss ratio on DSI policies, determining ways to avoid the high loss ratio, evaluating the financial impact of paying claims based on the final amount accepted as payment-in-full, and implementing a new claims payment methodology.  Conversely, Transamerica argues all the documents were prepared in anticipation of litigation because Edwards recognized the threat of policyholder litigation in May 2004.  (*See* Edwards Decl. ¶ 4, *Hege* ECF No. 83-1.)

In a similar case against Life Investors, an Oklahoma district court passed upon precisely this issue and concluded as follows:

> Defendant argues that it could reasonably have anticipated that litigation would be filed if it changed its interpretation of actual charges. . . . However, until defendant made a firm decision to change its interpretation of "actual charges," defendant had no reason to believe that "actual charges" litigation was likely to arise.  Defendant also argues that the Taskforce consulted with in-house and outside counsel, and several hypothetical litigation scenarios were discussed. . . . While there may have been a hypothetical risk that litigation might arise out this decision, the mere fact that the Taskforce consulted in-house or outside counsel about potential litigation scenarios does not mean that defendant was acting in anticipation of litigation.

*Lindley v. Life Invs. Ins. Co. of Am.*, Nos. 08-CV-0379-CVE-PJC, 09-CV-0429-CVE-PJC, 2010 WL 1741407, at *4 (N.D. Okla. Apr. 28, 2010).  This Court finds the *Lindley* district court's reasoning consistent with *National Union*'s rule that the protection arises only "following an actual event or series of events that reasonably could result in litigation."  967 F.2d at 984.  This Court therefore

concludes that Life Investors did not "anticipate litigation" until it decided to change its claims methodology. Prior to that decision, the DSI Taskforce's "driving force" behind creating the documents was to determine the causes of the DSI policies' high loss ratios and then to keep the policies financially viable while avoiding premiums increases. These were primarily business purposes. Until the decision was made, there was no event that "reasonably could result in litigation." Litigation over the proposed change to DSI claims payment methodology was not a real likelihood, but rather merely a general possibility.[6]

The question, then, is when did Life Investors make that decision? Whitlock testified that she made the decision to change the methodology and that the decision was hers to make. (Dep. of Connie Whitlock 91:19–91:25, Jan. 7, 2010, *Belue v. Aegon USA, LLC*, 7:08-cv-3830 (D.S.C.), *Hege* ECF No. 66-8.) She made this decision in July 2005. (Transamerica's Resp. 5.) Thus, Transamerica did not anticipate litigation, within the meaning of Rule 26(b)(3), until July 2005.

---

[6] This Court acknowledges that in *Lindley*, the magistrate who initially decided the dispute concluded that Transamerica began anticipating litigation when it contacted Jorden Burt in October 2004, see *Lindley v. Life Invs. Ins. Co. of Am.*, 267 F.R.D. 382, 401 (N.D. Okla. 2010), and that on appeal of the magistrate's order, the district judge affirmed the magistrate's conclusion, *see Lindley*, 2010 WL 1741407, at *4. However, the district judge reviewed the magistrate's conclusion with great deference, and the district judge's reasoning quoted above suggests that, were the issue initially before by the district judge, she may we;; have reached a different conclusion.

All of the remaining disputed documents were created before Whitlock changed the claims methodology. Accordingly, none of them were prepared in anticipation of litigation and therefore are not protected attorney work product.

In sum, Transamerica's arguments regarding the remaining disputed documents are without merit.[7] Because the disputed documents are sufficiently relevant to the claims and defenses in these cases, *see* Fed. R. Civ. P. 26(b)(1), Plaintiffs' Motions to Compel are granted.

## II.  Motion for Protective Order

Transamerica's Motion for Protective Order concerns the deposition of Stephen Gwin. As discussed above, in 2004, Gwin performed financial calculations and prepared Charts reflecting his analysis, which Jorden Burt attorneys used for their Report. When litigation over the new payment methodology ensued, Jorden Burt also represented Life Investors in many of the actions. In 2008, at Jorden Burt's direction, Gwin performed additional analyses and calculations for Jorden Burt to use in mediation and settlement negotiations in several cases.

On February 18, 2011, Plaintiffs' counsel deposed Gwin and asked Gwin the following questions:

---

[7] This Court's Order applies only to the documents submitted for *in camera* review, as those documents are the only ones over which a live dispute still exists. This Court expresses no opinion as any other documents, and its Order should not be construed to extend to any document not specifically mentioned on pages 5 or 6 of this Order.

> Q: Did you make any documentary contributions by way of charts or exhibits or other data to the report?
>
> . . . .
>
> Q: Were you asked to make any calculations as to the value to insureds or class members of the *Runyan* class action settlement?

(Dep. of Stephen Gwin, 125:23–127:9, Feb. 18, 2011, *Hege* ECF No. 62-3.) Transamerica's attorney objected to the questions and instructed Gwin not to answer. (*Id.* at 126:1–126:2, 127:10–127:14.)

Transamerica seeks an order precluding Plaintiffs from eliciting deposition testimony from Gwin regarding (1) his documentary contributions to the Jorden Burt Report, and (2) calculations he made at the request of counsel in connection with mediation and settlement discussions. Transamerica argues the testimony in question is protected by both attorney–client privilege and the work product doctrine.

A court may, for good cause, issue an order protecting a party or person from discovery likely to result in annoyance, embarrassment, oppression, or undue burden or expense. Fed. R. Civ. P. 26(c)(1). Among other things, a court may forbid or limit the scope of inquiry into certain matters. *Id.* 26(c)(1)(D). The party seeking protection must show "good cause" by making a specific demonstration of facts in support of the request, as opposed to conclusory or speculative statements about the need for a protective order and the harm that will be suffered without one. *Brittain v. Stroh Brewery Co.*, 136 F.R.D. 408, 412 (M.D.N.C. 1991).

This Court's analysis regarding Plaintiffs' Motions to Compel resolves both portions of Transamerica's Motion for Protective Order. First, Transamerica argues attorney–client privilege and the work product doctrine preclude Gwin from testifying about his contributions to the Jorden Burt Report. As discussed above, though, neither the Jorden Burt Report nor Gwin's contributions thereto are protected under either theory. Thus, Transamerica's arguments regarding Gwin's contributions to the Jorden Burt Report are without merit. Plaintiffs' counsel may question Gwin only about the calculations and analyses he conducted, as well as the resulting charts he prepared, for use in the Jorden Burt Report. *See* Fed. R. Civ. P. 26(c)(2).

Transamerica also seeks to protect Gwin from testifying about the calculations and analyses he performed in connection with confidential mediation and settlement negotiations in several "actual charges" lawsuits against Transamerica. Those negotiations took place in 2008, well after Transamerica began "anticipating" litigation in July 2005. Indeed, by 2008, Transamerica had moved past mere anticipation into the thick of actual litigation, as DSI policyholders had filed numerous actions across the country. Thus, Transamerica's request for protection from this line of questioning is warranted. *See Elkins v. District of Columbia*, 250 F.R.D. 20, 26 (D.D.C. 2008) (stating that, in order for work product doctrine to apply, the materials in question need not have been specifically for the case in which their discovery is later sought). Plaintiffs' counsel may not inquire into the calculations or analyses Gwin performed for the purposes of settlement or mediation negotiations.

IT IS THEREFORE ORDERED THAT Plaintiffs' Motion to Compel (*Hege* ECF No. 66; *Bowman* ECF No. 30; *Miller* ECF No. 31; *Bridgmon* ECF No. 36) and Omnibus Motion to Compel Production of Documents (*Hege* ECF No.69; *Bowman* ECF No. 33; *Miller* ECF No. 34; *Bridgmon* ECF No. 39) are GRANTED.  Transamerica shall produce the documents ordered above to Plaintiffs on or before May 16, 2011.

IT IS FURTHER ORDERED THAT Transamerica's Motion for Protective Order (*Hege* ECF No. 63; *Bowman* ECF No. 27; *Miller* ECF No. 28; *Bridgmon* ECF No. 33) is GRANTED IN PART and DENIED IN PART.  Before the closing date for discovery in these cases, Stephen Gwin's deposition shall be re-opened so that Plaintiffs' counsel may question Gwin about the calculations and analyses he conducted, as well as the Charts he prepared, for use in the Jorden Burt Report.  Plaintiffs' counsel shall not question Gwin regarding the calculations and analyses he conducted for settlement and mediation negotiations.

**IT IS SO ORDERED.**

G. Ross Anderson, Jr.
Senior United States District Judge

May   10  , 2011
Anderson, South Carolina